[No. D016586. Fourth Dist., Div. One. Sept. 30, 1994.]

ISMAEL HERNANDEZ et al., Plaintiffs and Appellants, v.
CITY OF ENCINITAS et al., Defendants and Respondents.

1051

## COUNSEL

Jonathan Lehrer-Graiwer and Claudia E. Smith for Plaintiffs and Appellants.

Rutan & Tucker, Joel D. Kuperberg and William W. Wynder for Defendants and Respondents.

## OPINION

**TODD, J.**—In this mandate proceeding (Code Civ. Proc., § 1085) challenging the validity of the housing element and, to a lesser extent, the land use element of the April 24, 1990, version of the general plan for the City of Encinitas (City), three of the six petitioners (Plaintiffs Ismael Hernandez, Hildeberto Garcia and Buenaventura Ayala) are homeless day laborers working for years in North San Diego County and living from January to July 1989 in makeshift shelters on City hillsides. When working full weeks they earn no more than $200 per week. The other three petitioners (Plaintiffs Indelisa Rivera, Gustavo Terrazas and Ramon Torres) are permanent employees of a nursery in the City and have been unable to find decent, affordable housing there. These three petitioners gross no more than $1,200 per month. Under state law the household income of the six petitioners is considered lower or very low. (Health & Saf. Code, §§ 50079.5, 50105.)

Generally, in three causes of action in the petition filed July 27, 1989, the petitioners contend City's general plan adopted March 29, 1989, unreasonably restricts housing opportunities for poor people through a variety of exclusionary residential policies. The petition relies on provisions of the state Planning and Zoning Law (Gov. Code,[1] § 65000 et seq.) and particularly requirements for the housing element of the City's general plan (§ 65583) and the requirement that zoning provide for least costly housing needs (§§ 65913, 65913.1).

In the first cause of action the petitioners challenge the adequacy of the general plan's housing element. In the second cause of action they contend there is inconsistency between the housing and land use elements. In the third cause of action the petitioners make their challenge to the zoning ordinance and its land use element as violating the least cost zoning provisions of sections 65913 and 65913.1.

The trial court denied relief on the first two causes of action in June 1990, after it had granted a continuance in November 1989 allowing the City to complete a revision of the housing element of its general plan.

After several stipulated continuances were granted, the court heard and decided the third cause of action adversely to petitioners in November 1991.

---

[1] All statutory references are to the Government Code unless otherwise specified.

Although the petitioners' request for a statement of decision was denied as untimely, the court nevertheless filed and served a statement of decision on January 13, 1992. On January 21, 1992, the court entered a judgment of dismissal of all three causes of action. This appeal followed.

Petitioners raise numerous issues of a substantive nature concerning the subject of City's compliance, primarily in the housing element of its general plan, with the requirements of the state planning and zoning law. Petitioners' main contentions are:

1. The City's 1990 housing element fails to substantially comply with the requirements of section 65583(a)[2] for the housing element of a general plan in that it fails to:

 a. Include the City's complete regional housing needs share as required by sections 65583(a)(1) and 65584(a), and it fails to evaluate the prior housing element's progress in implementing its housing program;

 b. Include an inventory of land as required by section 65583(a)(3);

 c. Adequately analyze and remove governmental constraints as required by section 65583(a)(4) and (c)(3);

 d. Adequately analyze the special housing needs of farm workers and the homeless;

 e. Substantially comply with the requirements of section 65583(b); and

 f. Substantially comply with the requirements of section 65583(c).

2. City's general plan is internally inconsistent in violation of section 65300.5.

3. Various provisions of City's zoning ordinance and its land use element violate sections 65913 and 65913.1, the least cost zoning law.

4. City's defenses do not absolve it from its obligation to zone sufficient vacant land at "appropriate standards" to meet its low and moderate income housing needs.

Applying the appropriate, clearly settled standard of review, which the parties also discuss at length, we find no basis for reversal in the foregoing arguments.

---

[2]For convenience, we delete use of "subdivision" or "paragraph" when referring to subparts of a section.

In addition to the above outlined contentions, petitioners make several arguments asserting errors of a procedural nature. We shall discuss these contentions in the last parts of this opinion, concluding that as to those involving the exercise of discretion (which is most of them) there is no showing of abuse. As to one of the asserted errors there is an insufficient record on appeal. Thus, the contentions of a procedural nature furnish no basis for reversal.

FACTS

City was incorporated October 1, 1986. It adopted the general plan of the County of San Diego until it could prepare its own. On March 29, 1989, nearly two years after City began preparing its own general plan, it adopted its first general plan. In June 1988 the City received a generally approving review of the draft housing element from the California Department of Housing and Community Development (HCD). The review was made under section 65585(c) as it then read, providing for advisory HCD review and report on the adoption or amendment of any housing element. (Stats. 1984, ch. 1009, § 20.5, pp. 3493-3494.) The changes HCD suggested for the housing element were incorporated in the full general plan. As was noted in the report, the City was relying on 1984 figures from the San Diego Association of Governments (SANDAG) prepared before the City was incorporated. Thus, the 1984 SANDAG housing data did not include figures for the City. However, with the aid of SANDAG certain extrapolated allocations of housing needs for the City were included in its draft and final 1989 housing element.

Along with the housing element, the City prepared a land use element, a zoning ordinance and an environmental analysis. City's master environmental assessment and environmental impact report identified biological, public safety and infrastructure constraints to developing large portions of the City. Between October 1987 and March 1989, when City adopted its first general plan, there was substantial involvement and direction by citizens, other government agencies, public utilities and community groups involving correspondence and numerous meetings and workshops.

Shortly after the adoption of the first general plan, SANDAG commenced development of a new, updated regional housing needs statement allocating existing and projected regional housing needs to all localities, including the City. In addition, by letter of July 27, 1989, HCD for the first time communicated some more revisions of the housing element were needed.

This July 27, 1989, lawsuit was filed the same day as the HCD letter. In September 1989 the City formally began the process of amending the

housing element in light of the new SANDAG regional housing needs allocation and the HCD comments.

Based on the need to amend the housing element, the trial court granted a continuance in November 1989 on City's motion. The record on appeal contains a notice of motion by petitioners for a preliminary injunction regarding housing and land use element challenge, with supporting points and authorities (§§ 65753(b), 65755, 65757), but includes neither a reporter's transcript of a hearing on the motion nor an order of the court with respect to the motion. Referring to a reporter's transcript of February 2, 1990, the parties' briefs indicate the court denied the motion for an injunction.

The housing element of the general plan was amended as of April 24, 1990.[3] On June 26, 1990, the trial court denied relief on the first two causes of action. On the first cause of action the trial court found "the Encinitas housing element substantially complies with Article 5 of the California Government Code." On the second cause of action the court found "petitioners have failed to show that certain stated policies of the Encinitas housing element directly contradict the Encinitas land use element."

After the trial court's determination of the first two causes of action upholding the housing element as amended, HCD issued a July 30, 1990, letter of review of the revised housing element pursuant to section 65585(c) as it then read. The HCD report states, in part, "there are several areas which still require revisions to bring the element into compliance with State housing element law . . . ." The report describes two areas HCD believes are in need of revision and attaches a two-page appendix detailing its recommended changes in five categories under the major headings, "Needs, Resources, and Constraints," and "Programs."

In June 1990 petitioners moved for issuance of a peremptory writ of mandate on their third cause of action for violation of sections 65913 and 65913.1, which they (and we) sometimes describe as the least-cost zoning law. The motion on the third cause of action was heard November 18, 1991, after several stipulated continuances were granted. During the delay a large record was accumulated. On November 20, 1991, the court filed an order on the third cause of action finding the City's ordinances conform to the requirements of sections 65913 and 65913.1, and denying the writ of mandate. As earlier stated there followed a statement of decision and judgment of dismissal.

---

[3]Due to the length of the housing element, over 100 pages, we reserve any description of its contents for the discussion portion of this opinion.

## Discussion

### I

Concerning the appropriate standard of review, the law is settled concerning the statutes dealing with the housing element of a general plan that are contained in article 10.6 (commencing with § 65580) of chapter 3 of the Planning and Zoning Law. The Legislature has expressly provided: "[T]he court's review of compliance with the provisions of this article shall extend to whether the housing element or portion thereof or revision thereto *substantially complies* with the requirements of this article." (§ 65587(b), italics added.) A statement of legislative intent adopted with this provision reads: "It is the intent of the Legislature that the term 'substantially complies,' as used in subdivision (b) of Section 65587, be given the same interpretation as was given that term by the court in Camp v. Board of Supervisors, 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620]." (Stats. 1984, ch. 1009, § 44.)

In *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620], the court addressed an argument that the trial court had impermissibly inquired into the merits of the general plan under review. *Camp* quoted the rule in *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111]: "The adoption of a general plan is a legislative act. Since the wisdom of the plan is within the legislative and not the judicial sphere, a landowner may not maintain an action in declaratory relief to probe the merits of the plan absent allegation of a defect in the proceedings leading to its enactment."

*Camp* then observed that the petitioners before it sought relief in mandamus and by injunction because of specific defects making the general plan inadequate and void for lack of compliance with law, a status which makes available the remedy of mandamus "to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station . . . ." (Code Civ. Proc., § 1085.) Noting inclusion of all the contents of a general plan specified by section 65302 is required, *Camp* states that if the plan adopted for the county "does not reflect substantial compliance with those requirements, the . . . responsible [governmental] agencies . . . have failed in the 'performance of an act which the law specially enjoins.' " (123 Cal.App.3d at p. 348.)

*Camp* then defines "substantial compliance" as meaning " '*actual* compliance in respect to the substance essential to every reasonable objective of the

statute,' as distinguished from 'mere technical imperfections of form.' " (123 Cal.App.3d at p. 348, quoting *Stasher* v. *Harger-Haldeman* (1962) 58 Cal.2d 23, 29 [22 Cal.Rptr. 657, 372 P.2d 649], original italics.) *Camp* concluded the trial court had made a necessary examination of the general plan "for substantial compliance with the statutory requirements, not an impermissible study of its 'merits.' " (123 Cal.App.3d at p. 348)

■ In *Buena Vista Gardens Apartments Assn.* v. *City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 297-298 [220 Cal.Rptr. 732] (*Buena Vista*), this court applied the standard set out in section 65587(b) and *Camp* directly to a review of a housing element of a general plan. Discussing the standard, we stated in part:

"The standard of review is not limited to whether there is a 'complete' or 'substantial' failure of a city to adopt a plan which 'approximates the Legislature's expressed desires' (*Bownds* v. *City of Glendale, supra,* 113 Cal.App.3d 875, 884 [170 Cal.Rptr. 342]) but whether there is *'actual* compliance' (*Camp* v. *Board of Supervisors, supra,* 123 Cal.App.3d 334, 348) with specified requirements. *Bownds* retains validity to the extent it prohibits a court from examining the 'merits' of an element. [Citations.]

"Finally, the appropriate standard of appellate review is whether the local adopting agency has acted 'arbitrarily, capriciously, or without evidentiary basis.' [Citation.] 'Because the question of substantial compliance is one of law, this court need not give deference to the conclusion of the trial court. [Citation.]' [Citation.]" (175 Cal.App.3d at p. 298; see also *Black Property Owners Assn.* v. *City of Berkeley* (1994) 22 Cal.App.4th 974, 980-981 [28 Cal.Rptr.2d 305].)

With these definitive statements of the appropriate standard of review at hand, it is unnecessary to set forth or further discuss other points the parties make about the standard.

## II

Petitioners contend the 1990 housing element fails to substantially comply with section 65583(a) in several respects. We find there is substantial compliance in each respect.

### A.

■ First, petitioners assert the housing element does not include the City's complete regional housing needs as required by sections 65583(a)(1)

and 65584(a), and it does not evaluate the prior housing element's progress in implementing its housing program. Section 65583(a)(1) requires the housing element contain "(a) [a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs," including "(1) [a]n analysis of population and employment trends and documentation of projections and a quantification of the locality's existing and projected housing needs for all income levels," and including "the locality's share of the regional housing need in accordance with Section 65584."

Section 65584(a) sets forth requirements for determining regional housing needs and sharing those needs at all income levels. HCD determines the regional share of the statewide need for housing at specified times under rules prescribing revision schedules of general plans (§ 65588), and each council of governments, such as SANDAG, determines the existing and projected housing needs for its region. Section 65584(a) provides in part: "The distribution of regional housing needs shall, based upon available data take into consideration market demand for housing, employment opportunities, the availability of suitable sites and public facilities, commuting patterns, type and tenure of housing need, the loss of units contained in assisted housing developments, as defined . . . that changed to non-low-income use through mortgage prepayment, subsidy contract expirations, or termination of use restrictions, and the housing needs of farmworkers. The distribution shall seek to reduce the concentration of lower income households in cities or counties which already have disproportionately high proportions of lower income households."

Petitioners argue the City ignored or misanalyzed its housing needs and problems in violation of section 65583(a), with the result of inaccurate objectives and mistaken programs which violate section 65583(b) and (c) as well. The basis of this argument is petitioners' looking at the period covered in the housing element's section 65583(a)(1) provision, reflecting a July 1991 to July 1996 period in which the February 1990 SANDAG "Regional Housing Needs Statement" (RHNS) for the City is included. The figure is 1,406 and is contained in a column entitled "5-Year Regional Share (7/91 to 7/96)" in a table of the February 1990 SANDAG RHNS.

City's housing element states in part:

"Section 65583(a) of the California Government Code requires that a City's Housing Element contain a determination of the City's share of the regional housing need. Section 65584 requires that the estimate of need be prepared by the local council of governments, based on data provided by

State HCD. SANDAG, as the San Diego region's council of governments provides its estimates in a periodic report titled the Regional Housing Needs Statement (RHNS).The latest RHNS for the San Diego Region is the 1990 RHNS.

"The 1990 RHNS terms the estimated share of need the 'regional share.' This is an estimate of the 'increase in the number of housing units needed' (RHNS, Ch. 3, Sec. B). The estimated regional share for Encinitas is 1406 for a five year period, broken down by household income categories as follows:

| | |
|---|---|
| "Very Low Income | 323 |
| "Lower Income | 239 |
| "Moderate Income | 295 |
| "Other (Upper) Income | 549 |
| "Total | 1406 |

"These income categories are the 'standard' ones as defined by HUD and accepted by State HCD. Very low are incomes below 50% of the median income for the region. Low are between 50% and 80% of the regional median. Moderate are between 80% and 120%, and other (upper) are above 120%."

Petitioners compare this housing element and SANDAG figure with a larger, 2,109 figure in another column of the SANDAG RHNS table. The 2,109 figure represents a total regional share for a seven-and-one-half-year period from January 1989 to July 1996. The lower, 1,406 figure is derived by multiplying the larger figure by five years and dividing the result by seven and one-half years.

It is fully appropriate that the 1990 revision of City's housing element should contain the figures in the February 1990 SANDAG RHNS applicable to the five-year period from July 1991 to July 1996. There is no basis in the statutory scheme, which merely requires review of the housing element "as frequently as appropriate," (§ 65588(a)) for the City to include in its 1990 revision the seven-and-one-half-year figure that began in January 1989. The revision process was inspired by both the availability of the first SANDAG RHNS making an allocation for the City and by the HCD comments after the adoption of the 1989 housing element. There is compliance with the law represented in the City's revision quantifying projected housing needs based on the updated, specifically applicable SANDAG data which took into account the total regional share for seven and one-half years starting in January 1989.

On this record showing City's express consideration and application of the requirements of sections 65583(a) and 65584, we conclude the housing

element's use of the 1,406 figure constitutes actual, and thus substantial, compliance with those provisions relating to quantifying the assessment of housing needs.

### B.

■ Petitioners contend the housing element fails to include an inventory of land as required by section 65583(a)(3), which requires the housing element to include "[a]n inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites." Petitioners appear to recognize there is a substantial portion of the housing element devoted to the subject of vacant sites and underdeveloped sites, complete with figures, tables and word descriptions. They argue, however, this effort represents "simply cataloguing the vacant acres already zoned residential (2434 acres)," and there is no "manifest attempt" to identify otherwise suitable land such as vacant or "infill" sites presently zoned commercial and no consideration given to mixed use potential, such as, for example, rental apartments.

The housing element points out that with 2,434 acres of vacant land planned for residential development there will be significant additional growth in the City. However, it is noted that much of the vacant land is planned for lower density development due to "substantial environmental constraints (including flooding problems, excessive slopes, soil limitations, and sensitive ecological resources) and other planning and infrastructure limitations (including limited circulation capacity and remoteness) . . . ." It is estimated that 17 percent of the 3,575 dwelling units that the vacant land will support will be in land use categories corresponding to multifamily development types.

Moreover, the housing element discusses and analyzes the inventory of underdeveloped sites available that may be "recycled" to higher density units. After setting forth recycling projections for the five-year period, the housing element states: "Through this recycling, adequate sites are provided to enable the City to meet its needs for multi-family housing development. In terms of housing affordability, these 198 units of multi-family housing are a significant contribution to [the] stock of housing which, combined with City incentives, inclusionary provisions, and State Coastal requirements, can be priced within lower income groups' range of affordability."

Finally, contrary to petitioners' assertion, the housing element considers a proposal for "mixed use development in commercial districts," involving

"inclusion of residential units along with development of principal commercial uses." Creation of 10 new units affordable by very low and low income households is the 5-year goal of such a proposal.

It is very clear from the foregoing that there is no merit to petitioners' contention the City violated the land inventory requirement of section 65583(a)(3). The record shows actual, substantial compliance with that provision.

C.

■ Next, petitioners contend the housing element fails to adequately analyze and remove governmental constraints as required by section 65583(a)(4) and (c)(3).[4] Petitioners again recognize that the housing element "includes some discussion of many of [City's land use constraints]." However, they find fault with the content of this discussion of governmental constraints which spans nine single-spaced pages and encompasses such topics as land use controls, density, growth management goals and policies, method of calculating density, zoning code, building height, parking standards, prohibition of attached units, building codes and enforcement, fees and improvements and local processing and permit procedures. Under the analysis of density in land use controls, for example, the housing element recognizes that a majority of the City has been designated single family residential, rural residential or residential single family 11, but notes: "[*T*]*he total number of new dwellings planned allows the City's 'regional share'* of new units identified in the 1990 Regional Housing Needs Statement (SANDAG) *to be satisfied.* In addition, approximately 24% of the City's new residential development potential (approximately 1300 of the 5380 new dwellings) fall within the multi-family residential categories, zones R-11 through R-25. This includes approximately 599 new units on vacant land, and 739 new units to result from 'recycling' or infill. Together with other measures such as allowance for accessory or 'second' units, this land use

---

[4]Section 65583(a)(4) requires:

"An analysis of potential and actual governmental constraints upon the maintenance, improvement, or development of housing for all income levels, including land use controls, building codes and their enforcement, site improvements, fees and other exactions required of developers, and local processing and permit procedures. The analysis shall also demonstrate local efforts to remove governmental constraints that hinder the locality from meeting its share of the regional housing need in accordance with Section 65584."

Section 65583(c)(3) requires that the program setting forth a five-year schedule of local government actions to implement and achieve the goals and objectives of the housing element, in order to make adequate provision for the housing needs of all economic segments of the community:

"Address and, where appropriate and legally possible, remove governmental constraints to the maintenance, improvement, and development of housing."

plan is expected to yield an adequate potential of new dwellings. *Rather than density, the 'market' constraints of land costs, construction costs, finance costs, etc. appear to be responsible for the lack of housing in the City . . . . Thus, density allowance under the plan is not concluded to be a significant constraint to housing.* Note, however, that density bonus allowances will remain available as a housing program." (Italics added.)

The conclusions that the SANDAG RHNS allocation will be satisfied and that the density allowance is not a significant constraint on affordable housing are certainly not arbitrary, capricious or without evidentiary basis. (See *Buena Vista, supra,* 175 Cal.App.3d 289, 298.) Accordingly, these determinations are to be upheld. Otherwise, the numerous considerations of governmental constraints set forth in the housing element allow no other conclusion than that there is actual compliance with the requirements of section 65583(a)(4) and (c)(3) in terms of the required analysis and removal of governmental constraints.

It is worthy of note, too, that the City's growth management plan contained in the land use element of the general plan contains a specific exemption applicable to "building permits for dwelling units guaranteed or assured of being affordable to very low and low income households, in amounts equal to the SANDAG determination of the City's regional need for housing for very low and low income households . . . ." Accordingly, there is no truth to petitioner's assertion that "[t]he City's growth management plan further restricts the development of housing at the lowest possible cost by limiting all housing development to artificially low annual and buildout levels and by not fully exempting low and moderate income housing from such constraints."

In connection with their section 65583(a)(4) and (c)(3) argument, petitioners engage in a lengthy and detailed critique of the governmental constraints aspect of the housing element. Petitioners' argument amounts to a claim the City reached the wrong conclusions. They assert City's conclusions are "incorrect," "invalid," or "false." As to the City's conclusion that most of the matters discussed are not governmental constraints, for example, petitioners urge "[t]he bases of this conclusion are empirically incorrect and unsubstantiated and are legally invalid rationalizations and speculations . . . ."

Since our review of the record discloses there is ample discussion of governmental constraints in the housing element and the conclusions reached in that discussion are not arbitrary, capricious, or without evidentiary support, we do not engage in a point by point analysis of the series of arguments presented. We observe that for the most part these arguments go to the

merits of the general plan, a matter which is beyond the scope of judicial review.

### D.

Petitioners contend the housing element fails to adequately analyze the special housing needs of farm workers and the homeless as required by section 65583(a)(6).[5] Here again the housing element discusses both categories of housing needs. In the case of farm workers petitioners claim a number of built-in impediments to housing are neither analyzed or removed. One such "impediment" is that jobsite housing conform to rural land use density limitations (one unit per one-to-eight-acre lot), a problem compounded by horticultural farms' relatively small size. Another is that farm worker housing is only allowed in conjunction with an existing single detached dwelling.

The housing element states in part: "The City has developed specific provisions in its zoning ordinance to facilitate housing for its agricultural worker population. The City's agricultural employee housing ordinance allows for such housing as a permitted accessory use in conjunction with an agricultural or horticultural operation. Such housing generally takes the form of mobile homes located on the farm property. *The Housing Element sets forth a program to review the current standards/limitations in this ordinance to provide incentives for the creation of accessory agricultural worker housing.* Housing opportunities for agricultural workers can further be expanded through implementation of programs to provide affordable housing opportunities." (Italics added.)

In addition, the housing element projects a doubling from 35 units in the past 5 years to 70 units for the succeeding 5 years for agricultural workers.

Concerning the homeless, the housing element analyzes the subject for a single-spaced page and one-half, pointing out the amount of service to homeless persons furnished by the one agency in the City, the Community Resource Center, and the characteristics of the persons receiving those services. On this subject the housing element concludes: "The number of temporary homeless seeking assistance from the Community Resource Center indicates a significant need which warrants programs to ameliorate. Programs set forth in this Element are designed to address the housing and social service needs of the homeless. Included are programs to accommodate

---

[5]Section 65583(a)(6) requires that the housing element's assessment of housing needs and inventory of resources, and constraints relevant to meeting those needs, include, "[a]n analysis of any special housing needs, such as those of the handicapped, elderly, large families, farmworkers, families with female heads of households, and families and persons in need of emergency shelter."

and encourage transitional housing services. A transitional housing facility provides shelter for specified period of time (perhaps as long as one year) and generally includes integration with other social services and counseling programs to assist in the transition to self-sufficiency through the acquisition of permanent income and housing. The City can help address this identified need by providing supplementary funding to the Community Resource Center, and encouraging the development of a transitional housing facility. In addition, by providing programs to maintain and expand affordable housing opportunities, the City can help to curtail additional persons and families from becoming homeless in the future."

From the foregoing described portions of the housing element which considers, deals with and makes provision for the housing needs of farm workers and the homeless, we can conclude with certainty there is substantial compliance with the requirement of section 65583(a)(6) for analysis of the special housing needs of farm workers and the homeless.

E.

██ Petitioners contend the housing element fails to substantially comply with the requirements of section 65583(b) which calls for, among other things, a statement of the community's quantified objectives "relative to the maintenance, preservation, improvement, and development of housing." Section 65583(b)(2) provides: "It is recognized that the total housing needs identified pursuant to subdivision (a) may exceed available resources and the community's ability to satisfy this need within the content of the general plan requirements outlined in Article 5 (commencing with Section 65300). Under these circumstances, the quantified objectives need not be identical to the total housing needs. The quantified objectives shall establish the maximum number of housing units by income category that can be constructed, rehabilitated, and conserved over a five-year time period."

As the City points out, the record does not support this contention. The numbers reflected in the housing element's statement of the City's estimated fair share based on the SANDAG 1990 RHNS, quoted above in part II A., *ante*, page 1061, represent a quantification as required by section 65583(b). Additional quantification is found in sections of the housing element under the titles "Residential Development Potential Compared with Regional Share Needs" and "Housing Objectives." Moreover, a housing programs table in the housing element identifies a total of 220 units to be rehabilitated and 1,192 units to be conserved in addition to the 1,410 units to be constructed during the 5-year goals period.

There clearly is substantial compliance with the quantification requirement of section 65583(b).

F.

■ Petitioners contend the housing element fails to substantially comply with each of the first four paragraphs of section 65583(c) which generally call for the housing element to set forth a five-year housing program containing certain elements that are stated in six separate paragraphs. The introductory paragraph of 65583(c) requires—

"A program which sets forth a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element through the administration of land use and development controls, provision of regulatory concessions and incentives, and the utilization of appropriate federal and state financing and subsidy programs when available and the utilization of moneys in a Low and Moderate Income Housing Fund of an agency if the locality has established a redevelopment project area pursuant to the Community Redevelopment Law (Division 24 (commencing with Section 33000) of the Health and Safety Code). In order to make adequate provision for the housing needs of all economic segments of the community, the program shall do all of the following. . . :"

1.

Section 65583(c)(1) requires identification of "adequate sites which will be made available through appropriate zoning and development standards and with public services and facilities needed to facilitate and encourage the development of a variety of types of housing for all income levels, including multifamily rental housing, factory-built housing, mobilehomes, emergency shelters, and transitional housing in order to meet the community's housing goals as identified in subdivision (b) . . . ."

Petitioners base their argument on a declaration of a San Diego State University Professor, Nico Calavito, that there was such a failure to identify appropriate sites for low and moderate income housing. However, examination of the housing element's discussion, tables and figures under the headings "Vacant Sites," "Underdeveloped Sites," "Accessory Apartments," "Farm Employee Housing" and "Residential Development Potential Compared with Regional Share Needs," discloses there is ample land site identification applicable to the various categories of housing needs. The housing element includes programs in each of the categories listed in section 65583(c)(1).

The court was not bound by the professor's opinion. It was fully appropriate for the court to determine substantial compliance without engaging in

an examination of the merits of the City's program. The petitioners' argument about the nonworkability of the housing element's facts and figures is a pure attack on the merits of this aspect of the plan based on an opinion the court was under no obligation to accept.

We find the housing element substantially complies with section 65583(c)(1).

2.

Section 65583(c)(2) requires that the five-year housing program schedule of actions include a provision to "[a]ssist in the development of adequate housing to meet the needs of low- and moderate-income households." Here, petitioners find defective certain language included with particular program descriptions, such as "investigate the feasibility," "consider supporting" and "make recommendations" that petitioners see as "Encinitas' refusal to give meaningful assurances."

This argument ignores the introductory portion of the "Housing Program Description" which begins with the sentence, "The following describes each of a full range of housing *programs to be implemented* by the City of Encinitas." (Italics added.) The introductory section also states in part: "The programs outlined below and set forth in Table 9 are designed to comprehensively address the City's identified housing needs. *When implemented successfully*, they are expected to achieve this goal." (Italics added.)

Later in the introduction it identifies certain of the programs, a total of six, that are not expected to be implemented within the 1990-1995 time frame due to funding limitations. Four of these uncertain programs are identified by petitioners as ones lacking City commitment. In light of the language in the introduction describing City's intent to implement the remaining programs, we cannot share petitioners' attribution to the City of a lack of commitment, except possibly with respect to the six it mentions are uncertain as a result of funding limitations. As to those six programs, however, the introduction notes they are not included in the quantitative five-year objectives, are not required to meet five-year goals, and are listed as optional programs in case opportunities for funding and administration arise, in which case they can augment the other five-year programs. This note reasonably is to be construed as indicating the City is committed to these six programs, subject to the availability of funding.

Otherwise, the programs listed include density bonuses in exchange for developers' agreements to construct affordable housing; "Inclusionary Housing Requirements" for development of lower income housing whenever

market-rate projects are developed; participation in the Federal Community Development Block Grant program; implementation of section 65590 requiring all new housing construction in the Coastal Zone (encompassing two-thirds of City land) include affordable units; establishment of an agricultural worker housing development assistance program to encourage accessory housing; and development of a transitional housing/emergency shelter assistance program.

It is apparent from the introductory language that even though cautious language is sometimes used in particular program descriptions, the City intends to implement the listed programs over the five-year period. Thus, the foundation of petitioners' argument falls away. The result is the conclusion there are adequate programs, listed in the housing element and intended to be implemented, for development of adequate housing to meet the needs of low and moderate income households. Accordingly, there is substantial compliance with section 65583(c)(2).

3.

Petitioners argue there is noncompliance with section 65583(c)(3) which requires that the five-year program "[a]ddress and, where appropriate and legally possible, remove governmental constraints to the maintenance, improvement, and development of housing." The absence of merit in this contention was discussed in part II C., *ante*, pages 1063 to 1065, where we observe the essence of the argument is petitioners' disagreement with the conclusions reached by the City. We cannot engage in such a discussion of the merits of the governmental constraints aspect of the housing element. (*Buena Vista, supra*, 175 Cal.App.3d at pp. 298, 302.)

4.

Petitioners contend the housing element fails to adopt any programs which conserve the affordability of the existing affordable housing stock as required by section 65583(c)(4), which requires the five-year program to "[c]onserve and improve the condition of the existing affordable housing stock, which may include addressing ways to mitigate the loss of dwelling units demolished by public or private action." In this connection petitioners argue that while the housing element "outlines a number of programs for conservation and rehabilitation of existing mobilehomes, rental units and single family homes, it fails to adopt any program which conserves the affordability of the City's existing affordable housing stock. . . . None of these programs require[s] maintenance of the affordability of housing and none of them [has] income standards directing [them] specifically at housing affordable to low or moderate income families."

Under the heading "Programs to Maintain Existing Affordable Housing Arrangements," the housing element discusses seven separate programs "aimed at maintaining the affordability and livability of the City's housing stock." In addition, the housing element sets forth programs of City participation in "Section 8" and "housing voucher" low income rental assistance programs as well as San Diego County's " 'Urban County' CDBG" program, a weatherization program which "acts to preserve existing affordable housing stock and enable target households to achieve affordable safe and sanitary housing with no financial impacts." It is thus clear that the housing element contains programs to "[c]onserve and improve the condition of the existing affordable housing stock," (§ 65583(c)(4)) and, as required by *Buena Vista, supra*, 175 Cal.App.3d 289, 303, these programs conserve " 'the existing affordable housing opportunities in the community.' "

We conclude the housing element substantially complies with section 65583(c)(4).

### III

Petitioners contend the City's general plan is internally inconsistent in violation of section 65300.5, which is a statement of legislative intent that the various general plan elements " 'comprise an integrated, internally consistent and compatible statement of policies for the adopting agency.' " (*Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 96-97 [212 Cal.Rptr. 273].) In *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 798, 800-801 [161 Cal.Rptr. 260], the court pointed out the appropriate scope of review is under Code of Civil Procedure section 1085, i.e., a determination of whether the agency action was arbitrary, capricious or entirely without evidentiary support, or procedurally defective under the law; section 65300.5 is "a general statement of policy," should be considered in the execution of general plans and amendments thereto, but "is no more than that, and there is nothing to indicate a legislative intent that it modifies the applicable scope of review." (100 Cal.App.3d at pp. 800, 801.) Moreover, *Karlson* makes the point: "The very reason for this limited review under Code of Civil Procedure section 1085 is to avoid the precise type of rigidity for which appellant argues by seeking to incorporate section 65300.5 in some mandatory fashion into the review. *The judgment decision rests with the City Council* and will not be set aside unless the council acted arbitrarily, capriciously or without any evidentiary basis. [Citation.]" (*Id.* at p. 801, italics added.)

Indeed, section 65751 provides: "Any action to challenge a general plan or any element thereof on the grounds that such plan or element does not

substantially comply with the requirements of Article 5 (commencing with Section 65300) shall be brought pursuant to Section 1085 of the Code of Civil Procedure."

Here, petitioners take a rigid approach to the housing and land use elements in urging there is inconsistency. As City points out, the housing element of the general plan states, "The Land Use Element of this General Plan and its implementing zoning regulations is the City's single most important 'housing program,' in providing for the number, and range of type, of housing units needed." Thus, consistency in the two elements is expressly considered.

Petitioners' claim of conflict as a result of an expressed desire to preserve a residential character for the community is not borne out by a reasonable reading of the two elements. The land use element goals and policies petitioners cite are consistent with such housing element policies as encouraging "a wide range of housing by location, type of unit, and price to meet existing and future needs . . . ," and providing housing "for all persons regardless of income . . . level . . . ." For example, the land use element policy that "[t]he residential character of the City shall be substantially single-family detached housing," does not represent any inconsistency with the stated housing element programs since the general plan, in the judgment of those adopting it, includes adequate land uses providing for the various levels of housing needs for the applicable program period.

Nor is there any actual inconsistency between the growth management program in the land use element and the housing element. The housing element itself shows the land use element's growth management program does not impede accommodating City's regional share. In addition, the growth management program expressly exempts lower income housing developed to meet the regional share. In no manner does this case fit within the concept that "[a] document that, on its face, displays substantial contradictions and inconsistencies cannot serve as an effective plan because those subject to the plan cannot tell what it says should happen or not happen." (*Concerned Citizens, supra,* 166 Cal.App.3d 90, 97.)

Accordingly, there is nothing in this case similar to the problem in *Concerned Citizens* where the general plan's "circulation element [was] internally inconsistent on its face and therefore incomprehensible." (166 Cal.App.3d at p. 97.)

Due to the rigid, merits-based nature of the arguments which are otherwise unsupported by the record, we reject the petitioners' additional arguments in furtherance of their inconsistency claim that "the midrange density

policy adopted by the Land Use Element effectively downzones all properties, further constraining and preventing the development of affordable housing even on the nine acres of vacant R-25 designated land," and "the Land Use Element also restricts any future attempts to rectify the exclusionary densities in the City by requiring voter approval for any increases in residential densities."

There is substantial compliance with the consistency provision of section 65300.5.

## IV

Petitioners contend various provisions of the City's zoning ordinance and its land use element violate sections 65913 and 65913.1, the least-cost zoning law. Section 65913.1, containing the substantive requirements of the least-cost zoning law,[6] provides in pertinent part: "In exercising its authority to zone for land uses, a city, county, or city and county shall designate and zone sufficient vacant land for residential use with appropriate standards, in relation to zoning for nonresidential use, and in relation to growth projections of the general plan to meet housing needs as identified in the general plan. For the purposes of this section, 'appropriate standards' shall mean densities and requirements with respect to minimum floor areas, building setbacks, rear and side yards, parking, the percentage of a lot which may be occupied by a structure, amenities, and other requirements imposed on residential lots pursuant to the zoning authority which contribute significantly to the economic feasibility of producing housing at the lowest possible cost given economic and environmental factors, the public health and safety, and the need to facilitate the development of housing for persons and families of low or moderate income, as defined in Section 50093 of the Health and Safety Code. However, nothing in this section shall be construed to enlarge or diminish the authority of a city, county, or city and county to require a developer to construct such housing."

After finding the City's ordinances conform to the requirements of sections 65913 and 65913.1, the trial court filed its statement of decision in part noting the housing element incorporates the SANDAG regional housing

---

[6]Section 65913 is a statement of legislative findings and declarations pertaining to the existence of a "severe shortage of affordable housing, especially for persons and families of low and moderate income," and to the need to encourage new housing by various specified means including law changes designed to assure that local governments "zone sufficient land at densities high enough for production of affordable housing," and "make a diligent effort through the administration of land use and development controls and the provision of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing. . . ."

need allocation totaling 1,406 units over the next five years, 857 of which are allocated to very low, lower and moderate income categories (and broken down into income categories as set forth in part II A, *ante*, p. 1061). The statement of decision continues, in pertinent part:

"The Housing Element further indicates that the City has adequate land zoned at appropriate densities to accomodate [*sic*] its share of lower income housing needs. [Housing Element, pp. H-56, H-46 (Table 6: vacant residential land inventory) and H-54 (Table 7: potential net increase in dwelling units on underdeveloped residential parcels).] The Court is persuaded by the City's argument that it can meet its identified housing needs of 857 lower and moderate income households through the several possible combinations of authorized densities within the 104 acres zoned R-8, R-11, R-15 and R-25. (See Respondent's memorandum of points and authorities filed November 1, 1991, pp. 8-9.)

"In addition, the Court finds that the City has designated and zoned sufficient vacant land for residential use with 'appropriate standards' which contribute significantly to the economic feasibility of producing housing at the lowest possible cost given economic and environmental factors, the public health and safety, and the need to facilitate the development of housing for persons and families of low or moderate income.

"Petitioners argue that the standards imposed by the City on residential development, to wit, densities, parking, height restrictions, prohibition on attached housing in zones RS-11 and lower, and restriction on more than two attached units in zones R-15 or lower, render 'least cost' housing economically infeasible.

"However, the Court finds that Petitioners' position fails to take into consideration environmental factors and the public health and safety as also required by Government Code section 65913.1. These matters were taken into consideration by the City in the adoption of its Housing Element. (Housing Element, pp. H-29, H-30.)"

The City's memorandum of points and authorities to which the court referred in its statement of decision states, in part:

"Conservatively assuming both that housing projects will be developed only at their density mid-range, and that density bonuses will not be requested, the Housing Element demonstrates that, over the coming 5-year period, Encinitas has 'appropriately' zoned land sufficient to accommodate an additional 1,410 units, compared with its identified 'housing needs' of 1,406 (Exh. E, p. H-57).

"Moreover, the Zoning Code, Land Use Element, and Government Code § 65915 all allow development at maximum densities within each zone, as well as a 'density bonus' of 25% for projects containing specified minimum proportions of lower income occupants (Exh. E, pp. H-66, H-67). Encinitas thus can easily meet its 'housing needs' of 857 lower and moderate income households through several possible combinations of authorized densities within just the 104 acres zoned R-8, R-11, R-15 and R-25, as follows:

| Zoning Designation | Net Acreage | Units At Mid-Range Density | Units At Maximum Density | Units At Maximum Den. With Bonus |
|---|---|---|---|---|
| Residential-8 | 52 | 335 | 416 | 520 |
| Residential-11 | 40 | 382 | 440 | 550 |
| Residential-15 | 3 | 35 | 45 | 56 |
| Residential-25 | 9 | 184 | 225 | 281 |
| Totals | 104 | 936 | 1126 | 1407 |

(Exh. E, p. H-46.)

"Since the Housing Element establishes that, even under the most conservative 'mid-range' scenario, Encinitas has zoned sufficient land for residential use to 'meet [its] housing needs as identified in the general plan,' the City's density designations are 'appropriate' as a matter of law." (Fns. deleted.)

A footnote to the table in the City's points and authorities states that the figures do not include approximately 290 additional units projected in the next 5 years from recycling of under-utilized land, accessory units and farm worker housing.

Much of petitioners' argument with respect to the least-cost zoning law consists of a restatement of their arguments about deficiencies in the housing element's analysis and removal of governmental constraints under section 65583(a)(4) and (c)(3). (See part II C., *ante*, pp. 1063-1065.) What we said in response to those arguments applies to this one as well. The bottom line is the City's determination that there is adequate zoning of land to accommodate the five-year SANDAG RHNS is supported by substantial evidence and is not arbitrary or capricious. Thus, the trial court's determination is correct.

We point out, contrary to petitioners' argument, Evidence Code section 669.5 does not preclude the presumption of validity (*Associated Home*

*Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604-605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]) from being applied to the ordinance, thus shifting the burden of proof to City to show the zoning regulations are necessary for the public health, safety or welfare. (See *Building Industry Assn.* v. *City of Camarillo* (1986) 41 Cal.3d 810, 821-822 [226 Cal.Rptr. 81, 718 P.2d 68].) A prerequisite to application of this statute is that it must involve an ordinance which renders the governing body's zoning in violation of section 65913.1. (Evid. Code, § 669.5(a)(2) and (b).) Unless a violation of section 65913.1 is established, the presumption of "impact on the supply of residential units available in an area" and the burden-shifting provisions of the statute do not come into play. Here, there is no such violation of section 65913.1.

As we have indicated, there is substantial evidence supporting the conclusion that the City adopted density and other land use standards with respect to vacant land for residential use that are sufficient "to meet housing needs *as identified in the general plan,*" as required by section 65913.1. (Italics added.) Moreover, there is no contravention of the "appropriate standards" definition in the section, which encompasses requirements that "contribute significantly to the economic feasibility of producing housing at the lowest possible cost *given economic and environmental factors, the public health and safety,* and the need to facilitate the development of housing for persons and families of low and moderate income . . . ." (Italics added.)

The general plan and its adoption process reflect consideration by the City not only of the need for housing at the lowest possible cost in the context of the SANDAG RHNS for the five-year period but also consideration of the environmental, safety and infrastructural constraints identified in environmental reports, a traffic analysis and a technical analysis of the general plan elements. The City struck a balance in adopting the general plan that is fully consistent with economic and environmental factors and the public health and safety.

Finally, we repeat our earlier observation to the effect that petitioners' arguments such as "the City's calculations are pure sophistry which should not have been dignified" are based on a judgment call by petitioners who simply choose to reject City's figures and engage in a rather conclusionary examination of the merits. We will not take part in this aspect of petitioners' argument. Moreover, we repeat, neither the trial court nor this court was or is bound to accept the conclusions of petitioners' experts, Professor Calavita and R. Scot Sellers.

We conclude the general plan comports with the least-cost zoning law.

## V

 Petitioners contend the land use element of the general plan restricts increases in residential densities by prohibiting any increases without majority vote approval, thus violating section 65913.1. Here, petitioners cite two land use policies which, with certain exceptions, provide "the allowable maximum density of any property designated for residential use shall not be increased except by the affirmative vote of a majority of those voting in the election approving the proposed increase," and "property designated/zoned for non-residential uses shall not be redesignated/zoned to allow residential uses except by the affirmative vote of a majority of those voting in the election approving the proposed increase."

The City argues these policies merely establish an automatic referendum procedure. This procedure is not truly described as a referendum. Only when City mandates residential density beyond the SANDAG quotas may the City subject a density change to a vote of the people for validity.[7] Both an amendment of a general plan and a rezoning of land are legislative acts subject to referendum. (*Yost* v. *Thomas, supra,* 36 Cal.3d 561, 570.) There is no violation of the least-cost zoning law to be found in these provisions.

## VI

 We have considered and we reject as without merit petitioners' additional contentions that the least-cost zoning law is violated by City's height limitations and parking restrictions for multifamily housing, and by the growth management program.

Similarly, we do not accept petitioners' contentions concerning the asserted inadequacy of City's reliance on environmental, fire protection and public facility considerations as factoring into the propriety of its land use and housing plans for purposes of determining compliance with the least-cost zoning law under section 65913.1. The statute specifically contemplates giving consideration to such factors when establishing "appropriate standards" and determining what is involved in "lowest possible cost given economic and *environmental* factors, the *public health and safety,* and the need to facilitate the development of housing for persons and families of low or moderate income . . . ." (Italics added.)

## VII

Petitioners contend their motion for a preliminary injunction under section 65753(b) should have been adjudicated without requiring a showing of

---

[7]See discussion in *Yost* v. *Thomas* (1984) 36 Cal.3d 561, 574 [205 Cal.Rptr. 801, 685 P.2d 1152].

irreparable injury. Although both petitioners and the City cite a reporter's transcript of February 2, 1990, as reflecting a hearing on such a motion, no such reporter's transcript is in the record on appeal. Petitioners' notice to prepare reporter's transcript requests only the reporter's transcript of the hearing on November 18, 1991, which is the only reporter's transcript included in the record on appeal. Nor does the record on appeal contain an order denying a motion for preliminary injunction.

Under these circumstances we are precluded from considering the contention of error in connection with the motion for a preliminary injunction. (*Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 246 [43 Cal.Rptr. 364]; *Rosenbloom* v. *Western Auto Transport* (1953) 120 Cal.App.2d 335, 340 [261 P.2d 21].)

## VIII

Petitioners make a series of challenges to matters procedural in nature that are susceptible to the abuse of discretion standard of review. ▮ "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478 [243 Cal.Rptr. 902, 749 P.2d 339].) Moreover, "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.] Further, the burden rests with the party challenging the [ruling] to make a clear showing of an abuse of discretion. [Citations.]" (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].)

Under these standards we reject the following contentions:

## A.

The trial court abused its discretion by not excluding Craig Jones's[8] testimony on environmental impacts of higher density development and by overruling petitioners' other evidentiary objections to his testimony. (See also Evid. Code, § 353(b).)

---

[8]Jones, a Senior Planner for the City, filed two declarations dated October 25, 1990, and November 14, 1991. Petitioners made numerous objections to admission of the earlier declaration on the ground the expert designation indicating the content of his testimony did not encompass environmental impacts. At the November 18, 1991, hearing they also objected to the declarations.

After the City represented Jones was summarizing 500 pages of material from numerous other governmental agencies, assisting the court, not offering independent opinions and explaining the material, the court overruled petitioners' objection.

## B.

The trial court should have excluded Craig Jones's testimony concerning environmental and public safety issues for violations of the discovery statutes.

## C.

At a minimum the court should have granted petitioners' request for a continuance. Although petitioners' written objections contain a claim in a footnote that at the very least they should be granted a continuance, they did not mention this request to the court at the hearing and they did not procure a ruling. Accordingly, in addition to the absence of a showing of abuse of discretion, the matter is deemed waived.

## D.

The trial court abused its discretion in overruling petitioners' evidentiary objections to portions of the Jones declaration.

## E.

The trial court abused its discretion in not excluding Terrence Austin's[9] testimony in its entirety and in overruling petitioners' evidentiary objections to portions of that testimony.

## F.

The court abused its discretion in not excluding Austin's declaration for the City's violation of the discovery statutes.

## G.

The trial court abused its discretion in overruling petitioners' evidentiary objection to portions of the declaration of Austin.

## H.

The trial court erred in not permitting petitioners to file their amended request for statement of decision and/or in denying their motion to amend

---

[9]Austin was an expert witness on the subject of the interrelationship of traffic and land use in the City's general plan. Petitioners' objection to his testimony was made primarily on the ground he had not produced his preliminary draft of a declaration, an event he explained in his deposition. Petitioners also objected on grounds Austin's testimony is contrary to the facts in the case and based on incomplete data.

their original request for statement of decision or for relief from default. In addition to the absence of a showing of an abuse of discretion, since there was actually filed a statement of decision which adequately discloses the court's views on the matter, there could be no showing of prejudice.

## DISPOSITION

Judgment and orders affirmed.

Work, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied October 25, 1994, and appellants' petition for review by the Supreme Court was denied January 5, 1995.