[No. H028369. Sixth Dist. Mar. 23, 2007.]

NORMA FONSECA et al., Plaintiffs and Appellants, v.
CITY OF GILROY et al., Defendants and Respondents.

**COUNSEL**

Public Interest Law Firm, Law Foundation of Silicon Valley; James F. Zahradka II, Kyra Kazantzis; California Rural Legal Assistance, Inc., Phyllis S. Katz; Public Advocates Inc., and Richard A. Marcantonio for Plaintiffs and Appellants.

Berliner Cohen, Andrew L. Faber, Linda A. Callon and Thomas P. Murphy for Defendants and Respondents.

**OPINION**

**DUFFY, J.**—This is an appeal from a judgment following the trial court's denial of a petition for writ of mandate under Code of Civil Procedure section 1085. Plaintiffs Norma Fonseca and Terry Wilson sued the City of Gilroy and its city council[1] to, among other things, set aside the City's 2002 general plan on the basis that its housing element does not meet or substantially comply with the requirements of the "Housing Element Law" codified at Government Code sections 65580 through 65589.8.[2] On appeal, plaintiffs, who are appellants here, reprise their challenge to the City's 2002 housing element. Specifically, they contend that Gilroy's 2002 housing element: (1) violates section 65583, subdivision (a)(3),[3] in that it does not contain an inventory of available residentially zoned land identified by parcel or site, and it also fails to provide the required analysis of these sites; (2) violates former section 65583, subdivision (c)(1)(A), in that it does not identify adequate housing sites that will be made available to meet Gilroy's allocated share of the regional housing need at all income levels for the 2001 through 2006 planning period; and (3) violates former section 65583, subdivision (c)(1)(A)(i), in that it does not alternately provide sufficient housing sites

---

[1] For ease we refer to defendants and respondents collectively as "the City" or "Gilroy."

[2] All further unspecified statutory references are to the Government Code. Further references to the "Housing Element Law" are specifically to these sections that together comprise article 10.6 of chapter 3 of division 1 of title 7 of that code.

[3] The parties do not dispute that the relevant version of section 65583 for purposes of this appeal is that effective in 2002 when Gilroy's general plan was adopted. (§ 65583, subd. (d).) Further references to "former section 65583" are to the version of the statute then in effect. (See Stats. 2001, ch. 671, § 2.) The section was amended and affected in important respects in 2004, effective January 2005, as we discuss, *post.* (Stats. 2004, ch. 724, §§ 1–3.)

that are zoned to permit multifamily residential use "by right" in order to otherwise meet the regional housing need.

Plaintiffs further contend that Gilroy's 2002 housing element violates the "Least Cost Zoning Law," codified at section 65913 et seq., in that it fails to zone sufficient residential sites at appropriate densities to facilitate the development of the regional housing need at each income level—read the lower income levels—during the current planning period.

While many of plaintiffs' arguments concerning the Housing Element Law are logical in terms of the law's ultimate goals—the promotion and facilitation of affordable housing—these arguments require us to go beyond the stated terms of the applicable statutory language and, in effect, rewrite it. The Legislature made amendments to the Housing Element Law in 2004 after Gilroy's adoption of its 2002 general plan to read, in essence, as plaintiffs contend we should read the prior law. In other words, plaintiffs' arguments largely point not to legal insufficiencies in Gilroy's 2002 housing element but instead to inadequacies and inefficacies in the prior statutory language, which, by these gaps, failed to adequately facilitate enforcement of the objectives of the Housing Element Law.

As noted, recent statutory revisions appear to have addressed the particular vagaries at issue here. Since 2005, the Housing Element Law has required the detail and specificity, particularly regarding the land inventory and identification of adequate sites to meet the locality's housing needs, which plaintiffs seek to impose on Gilroy with respect to its 2002 housing element. (See §§ 65583, 65583.2; Stats. 2004, ch. 724, §§ 1, 3.) Plaintiffs nevertheless contend that these statutory changes merely "clarified" existing law, and that we should apply prior law as the revisions now read. In light of the Housing Element Law as it existed in 2002 and the actual language of former section 65583, as well as the boundaries of judicial review that limit our analysis to whether Gilroy's 2002 housing element substantially complies with that statute, we reject plaintiffs' contentions.

We likewise reject their contentions concerning Gilroy's lack of compliance with the Least Cost Zoning Law. In sum, this is so because Gilroy's 2002 general plan substantially complied with the Housing Element Law that was in effect at the time the plan was adopted. And Gilroy was not required to rezone (in order to facilitate increased high-density housing) in 2002 upon its adoption of that general plan, or immediately thereafter, as plaintiffs contend. The Least Cost Zoning Law does not set such a deadline and instead contemplates rezoning by a public entity pursuant to its general plan within the five-year planning period covered by that plan. Gilroy's plan sufficiently

describes rezoning efforts to be undertaken to accommodate low-income housing within this five-year period such that it complies with the Least Cost Zoning Law.

We accordingly affirm the trial court's judgment.

## GENERAL LEGAL BACKGROUND

We begin with a general legal overview in order to place the issues in proper context. The Housing Element Law, like the Least Cost Zoning Law, is one component of state laws affecting land use, which is otherwise largely a local function.

### I. *The Source of Local Authority—The Police Power*

■ Under the California Constitution, a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) This authority is often referred to as the police power. (75 Ops.Cal.Atty.Gen. 239, 240 (1992); see, e.g., *Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876].)

The police power is broad. As the California Supreme Court has stated: "Under the police power granted by the Constitution, counties and cities have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. (Cal. Const., art. XI, § 7.) Apart from this limitation, the 'police power [of a county or city] under this provision . . . is as broad as the police power exercisable by the Legislature itself.' " (*Candid Enterprises, Inc. v. Grossmont Union High School Dist., supra,* 39 Cal.3d at p. 885.)

It is from this fundamental power that local governments derive their authority to regulate land through planning, zoning, and building ordinances, thereby protecting public health, safety and welfare. (*Berman v. Parker* (1954) 348 U.S. 26, 32–33 [99 L.Ed. 27, 75 S.Ct. 98]; see generally Curtin, Cal. Land Use and Planning Law (26th ed. 2006) pp. 1–4; Hagman et al., Cal. Zoning Practice (Cont.Ed.Bar 1969) §§ 4.14, 4.16, pp. 112–113; *id.* (Cont.Ed.Bar 2005 supp.) §§ 4.14, 4.16, pp. 231–232.)

### II. *State Planning Laws and the General Plan*

■ While the police power is the constitutional source of local governments' land use authority, the framework for the exercise of that power is provided by the state's land use planning statutes. (§§ 65100–65910; see

*L.I.F.E. Committee v. City of Lodi* (1989) 213 Cal.App.3d 1139, 1148 [262 Cal.Rptr. 166]; Curtin, Cal. Land Use and Planning Law, *supra,* p. 5.)

Among other things, state planning law requires adoption of a general plan. (§ 65300.) In the universe of local land use enactments, the general plan is "at the top of 'the hierarchy of local government law regulating land use.' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773 [38 Cal.Rptr.2d 699, 889 P.2d 1019] (*Devita*).) Our state's high court has described "the function of a general plan as a 'constitution,' " and has labeled it the " 'basic land use charter governing the direction of future land use' " in the locality. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540, 542 [277 Cal.Rptr. 1, 802 P.2d 317]; see also, e.g., *DeVita, supra,* at p. 773.)

■ Local land use decisions must be consistent with the general plan. Thus, for example, zoning ordinances, which are subordinate to the general plan, are required to be consistent with it. (§ 65860, subd. (a); *Lesher Communications, Inc. v. City of Walnut Creek, supra,* 52 Cal.3d at p. 541.) The same is true of other local activities affecting land use, such as tentative maps or development agreements. (Curtin, Cal. Land Use and Planning Law, *supra,* p. 10.) "Under state law, the propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." (*Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806 [184 Cal.Rptr. 371].) "Since consistency with the general plan is required, absence of a valid general plan, or valid relevant elements or components thereof, precludes enactment of zoning ordinances and the like." (*Ibid.*) "The general plan consists of a 'statement of development policies . . . setting forth objectives, principles, standards, and plan proposals.' (. . . § 65302.) The plan must include seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address each of these elements in whatever level of detail local conditions require (*id.,* § 65301)." (*DeVita, supra,* 9 Cal.4th at p. 773.)

III. *The Housing Element*

Declaring affordable housing "a priority of the highest order" and one not merely a local concern but a matter of "vital statewide importance," the Legislature in 1980 enacted legislation to require each local government to adopt a "housing element" as a component of its general plan. (§§ 65580, subd. (a), 65581, subd. (b), 65582, subd. (d).) According to the Housing Element Law, a public locality's general plan "must include a housing element consisting of several mandatory components." (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 978 [28 Cal.Rptr.2d 305] (*Black*).)

"The housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and shall make adequate provision for the existing and projected needs of all economic segments of the community." (§ 65583.)[4]

 The housing element must contain a five-year program to "implement the policies and achieve the goals and objectives of the housing element through the administration of land use and development controls." (§ 65583, subd. (c).) Formerly, the program must also have identified adequate sites with services and facilities that would be made available for "the development of a variety of types of housing for all income levels . . . in order to meet the community's housing goals . . . ." (Former § 65583, subd. (c)(1)(A).)

The housing element must further include an inventory of sites suitable for residential development and an analysis of the zoning, public facilities, and services available for those sites. (§ 65583, subd. (a)(3).) If the inventory of sites does not identify adequate sites to accommodate the need for housing of persons of all income levels,[5] the five-year program must provide for sufficient sites to be zoned for multifamily residential use to accommodate very-low- and low-income households. (Former § 65583, subd. (c)(1)(A)(i); see now § 65583.2, subd. (h).) If the total housing needs exceed the available resources and the community's ability to satisfy the need, the quantified objectives need not equal the need but must be the maximum number of housing units that can be constructed, rehabilitated, and conserved for each income category over a five-year period. (§ 65583, subd. (b)(2).)

 Thus, the five-year program must identify a sufficient number of sites that will be made available through appropriate zoning and development standards to meet the quantified objectives for housing for all income levels. And if the program does not identify sufficient sites to satisfy the need for housing for all income levels, it must in any event identify sufficient sites to be zoned for multifamily housing for low- and very-low-income residents. (Former § 65583, subd. (c)(1)(A)(i); see now § 65583.2, subd. (h).)

 In creating its housing element, the local government is required to consider the advisory guidelines adopted by the state's Department of

---

[4] In 2002 at the time when Gilroy adopted its current general plan, section 65583's specific requirements were set forth in former subdivisions (a) through (e), the pertinent subdivisions of which we will discuss relative to the particular issues addressed below.

[5] See footnote 8, *post*.

Housing and Community Development (the Department). (§ 65585, subd. (a).) The locality is also required to submit draft housing elements or amendments to the Department prior to adoption. (§ 65585, subd. (b).) The Department, in turn, must review drafts and make written findings as to whether the draft substantially complies with the requirements of article 10.6. (§ 65585, subds. (b), (d).) The local government must then consider the Department's findings. (§ 65585, subd. (e).) If the findings reflect noncompliance in the Department's judgment, the locality must either change the draft, so that it substantially complies with article 10.6, or adopt the draft without changes, explaining why the draft substantially complies despite the Department's findings. (§ 65585, subd. (f)(1), (2).) Under section 65589.3, the housing element (or its amendment) enjoys a rebuttable presumption of validity if the Department makes a finding that it substantially complies with the requirements of article 10.6. (§ 65589.3.) The statute does not provide for the converse, i.e., there is no presumption of invalidity on the basis of the Department's finding of noncompliance.

■ After each local government adopts its general plan, it "must review its housing element periodically to evaluate the community's progress toward attainment of local and state housing goals and objectives, among other factors." (*Black, supra,* 22 Cal.App.4th at p. 978.) By legislative edict, "the housing element 'shall' be reviewed as frequently as necessary to evaluate certain enumerated factors" subject to the statutory schedule for revisions. (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 296 [3 Cal.Rptr.2d 504], overruled on another ground in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 [29 Cal.Rptr.2d 804, 872 P.2d 143].) As provided in section 65588, subdivision (b): "The housing element shall be revised as appropriate, but not less than every five years, to reflect the results of this periodic review." But the statute contains an overriding provision, subdivision (e), which governs specified localities. It states: "Notwithstanding subdivision (b) or the date of adoption of the housing elements previously in existence, each city, county, and city and county shall revise its housing element according to the following schedule: [¶] . . . [¶] (2) Local governments within the regional jurisdiction of the Association of Bay Area Governments: December 31, 2001, for the third revision, and June 30, 2007, for the fourth revision."[6] (§ 65588, subd. (e).) ■ These timetables for revision of the housing element have been held to be directory, not mandatory. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo*

---

[6] Section 65584.02, subdivision (a)(2)(C), second paragraph, adopted in 2004, provides for a maximum two-year extension of the housing element deadline "for the purpose of coordination with the scheduled update of a regional transportation plan pursuant to federal law." The Department has granted such an extension to the Association of Bay Area Governments (ABAG) so that the deadline under section 65588, subdivision (e), for the fourth housing element revisions in jurisdictions within this designation, which includes Gilroy, is extended to June 30, 2009.

(1995) 38 Cal.App.4th 523, 544 [45 Cal.Rptr.2d 117] [the timetable set by § 65588 is directory rather than mandatory and mere noncompliance with the schedule does not operate to automatically invalidate a housing element or, by extension, a general plan].)

### IV. *Initial Review of a Housing Element*

A local government's housing element, or any portion thereof, may be challenged by "any interested party" by a traditional mandamus action filed in the superior court under Code of Civil Procedure section 1085. (§ 65587, subd. (b).) The court's review "shall extend to whether the housing element or portion thereof or revision thereto substantially complies with the requirements of [the Housing Element Law]." (*Ibid.*) " ' " 'Substantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of form.' " [Citation.]' " (*Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 298 [220 Cal.Rptr. 732] (*Buena Vista*); see *Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348 [176 Cal.Rptr. 620].) Simply stated, "[j]udicial review of a housing element for substantial compliance with the statutory requirements does not involve an examination of the merits of the element or of the wisdom of the municipality's determination of policy." (*Black, supra,* 22 Cal.App.4th at p. 980.) It merely involves a determination whether the housing element includes the statutory requirements. (*Buena Vista, supra,* at pp. 298, 306 [court looks only to ensure that the requirements of § 65583 are met, not whether the programs adopted are adequate to meet their objectives or are the programs the court thinks ought to be there].) Under section 65587 and Code of Civil Procedure section 1085, then, the court's role in determining a mandamus challenge to a locality's housing element is simply to determine whether the locality has satisfied statutory requirements. It is not to reach the merits of the element or to interfere with the exercise of the locality's discretion in making substantive determinations and conclusions about local housing issues, needs, and concerns.

### V. *The Least Cost Zoning Law*

Echoing the purposes of the Housing Element Law to promote the development of affordable housing, in 1980, the Legislature also enacted the Least Cost Zoning Law, section 65913 et seq. These changes in the law were intended to be "consistent with the responsibility of local government to adopt the program required by" section 65583, subdivision (c). (§ 65913, subd. (a).) The changes were also expressly designed to: "[e]xpedite the local and state residential development process"; (2) "[a]ssure that local governments zone sufficient land at densities high enough for production of affordable housing"; and (3) "[a]ssure that local governments make a diligent effort

through the administration of land use and development controls and the provision of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing . . . ." (*Ibid.*)

Section 65913.1 states in relevant part that "[i]n exercising its authority to zone for land uses and in revising its housing element . . . , a city, county, or city and county shall designate and zone sufficient vacant land for residential use with appropriate standards, in relation to zoning for nonresidential use, and in relation to growth projections of the general plan to meet housing needs for all income categories as identified in the housing element of the general plan." (§ 65913.1, subd. (a).)

██ Thus, section 65913.1 governs land use designation and zoning while section 65583 governs the housing element of a general plan. The two statutes were intended to work in concert. (§ 65913, subd. (a).)[7]

## STATEMENT OF THE CASE

### I. *Factual Background*

As noted, under section 65588, each local government within the regional jurisdiction of ABAG, of which Gilroy is one, was to prepare and adopt a revised and updated housing element by December 31, 2001, to cover the period January 1, 2002, to June 30, 2007. Gilroy's allocated regional "fair share" of affordable housing to be accommodated during the period from 1999 through June 2007 included 1,240 new lower income housing units— 906 units affordable to very-low-income households and 334 units affordable to low-income households. [8,9]

---

[7] Thus, our analysis below of plaintiffs' challenge under the Least Cost Zoning Law is also in relation to the version of the Housing Element Law that was in effect in 2002 when Gilroy adopted the housing element at issue.

[8] Under section 65584 of the Housing Element Law, the Department "shall determine the existing and projected need for housing for each region . . . ." (§ 65584, subd. (a)(1).) This is known as the "Regional Housing Needs Allocation." For purposes of the contents of the housing element as provided under section 65583, "the share of a city or county of the regional housing need shall include that share of the housing need of persons at all income levels within the area significantly affected by the general plan of the city or county." (§ 65584, subd. (a)(1).) "Household income levels" refer to four different levels of affordability: (1) very low incomes as defined by Health and Safety Code section 50105; (2) lower incomes as defined by Health and Safety Code section 50079.5; (3) moderate incomes as defined by Health and Safety Code section 50093; and (4) above moderate incomes as defined by Health and Safety Code section 50093. (§ 65584, subd. (e)(1)–(4).)

[9] In its 2002 housing element, Gilroy included ABAG's determination of its regional fair share housing allocation for this period. But it also reflected that by 2002, 779 of the 906 units remained to be built for very-low-income households and 103 of the 334 units remained for

In accordance with the Department's mandatory review of its proposed housing element under section 65585, Gilroy submitted a draft housing element accompanied by a "Housing Background Report" to the Department in December 2001. According to the City, the Housing Background Report is a part of the housing element. The Department reviewed the documents and found the draft housing element to be out of compliance with state law. The Department notified the City of its findings by letter dated March 1, 2002, and accompanying appendix of specific comments.

Gilroy adopted the draft housing element without change on June 13, 2002,[10] and again submitted it to the Department for review.[11] The Department then completed its formal review of the adopted housing element under section 65585. In October 2003, the Department issued its written determination that the adopted element did not substantially comply with the Housing Element Law, for the same reasons that the Department had considered the previously submitted draft to be noncompliant.

In May 2003, before the Department issued this determination, and prior to the City's formal adoption of its housing element, the City had submitted to the Department comments and proposed revisions to its draft housing element, which were intended to be responsive to the Department's initial March 2002 review. These materials included proposed revisions to the land inventory and a table of vacant and underutilized land with parcel-level data for sites within the general plan area but outside the city limits and the urban service area. The City also submitted supplemental materials at some later point. And third parties, including the Public Interest Law Firm, California Rural Legal Assistance, Inc.,[12] and the California Affordable Housing Law Project, submitted comments to the Department as well.

After its review of the proposed amendments, the supplemental materials, and third party comments, in December 2003, the Department notified the City by letter that while some of the City's responses had addressed some of the Department's concerns as outlined in its March 2002 review, further revisions to the housing element were necessary in order to render it compliant with state law from the Department's perspective. The Department

---

low-income households, reducing the total ABAG number of units to be provided in these two income categories to 882 in the 2002 housing element.

[10] It is not clear whether in adopting the element, the City explained under section 65585, subdivision (f), why, in its view, it had substantially complied with the Housing Element Law notwithstanding the Department's negative finding.

[11] The specific contents of relevant portions of the housing element are discussed below where they relate to our analysis.

[12] These two entities represent plaintiffs in this litigation.

specifically concluded, in reliance on its "Questions and Answers"[13] as guidelines, that "the element should identify adequate sites and demonstrate the realistic development capacity and potential of sites for all income groups, further analyze and mitigate governmental constraints, and strengthen certain programs." The Department's letter was accompanied by an appendix that addressed these issues in further detail and identified, from the Department's point of view, what changes in the housing element were needed to bring it into legal compliance. Included among these identified shortcomings were those of which plaintiffs complained below—the failure to include a site-specific inventory of land demonstrating adequate sites to accommodate Gilroy's affordable housing need and the failure to provide analysis and removal of governmental constraints to the construction of affordable housing on those sites.

## II. *Procedural Background*

Plaintiffs, each of whom is alleged to be a current or former resident of Gilroy who cannot obtain affordable housing in that locale, filed their verified petition for writ of mandate under Code of Civil Procedure section 1085 in May 2004.[14] They filed an amended petition a few months later.[15] The amended petition contained eight causes of action, only the first two of which pertain to this appeal. The first cause of action was entitled "writ of mandate to compel the preparation and adoption of a legally sufficient housing element." (Capitalization omitted.) It challenged Gilroy's 2002 housing element in numerous respects, only three of which are again raised here— inadequate land inventory and analysis of sites in violation of section 65583, subdivision (a)(3); failure to identify adequate sites for very-low- and low-income housing development in violation of former section 65583, subdivision (c)(1)(A); and failure to include any program to allow very-low- and low-income housing development by right in violation of former section 65583, subdivision (c)(1)(A)(i).

The second cause of action was entitled "writ of mandate to compel compliance with the Least Cost Zoning Law," and it challenged Gilroy's

---

[13] The Department's "Questions and Answers" (Q's & A's) are the guidelines it adopted under Health and Safety Code section 50459 and distributed to localities to assist in their preparation of housing elements and to facilitate the Department's review of those housing elements under section 65585.

[14] The parties raise no issue about the timeliness of the action under section 65009, subdivision (d), which provides for a one-year statute of limitations for actions brought, as this one at least in part is, under section 65587.

[15] The petition was again amended in October 2004 only to add a required verification, mooting the City's challenge by demurrer to the previous pleading for this deficiency. But for our purposes, the second amended petition is in all substantive and relevant respects the same as the first amended petition and we refer here to both as the "amended petition."

alleged lack of compliance with sections 65913 and 65913.1 by the failure to "designate and zone sufficient land at sufficient densities and with appropriate standards to accommodate the housing needs of very-low and low-income households." Below and here, plaintiffs' essential challenge on the basis of the Least Cost Zoning Law concerns whether Gilroy's rezoning plans, expressed as part of its housing element revisions, satisfy the law in terms of both the affirmative obligation to rezone and the time within which that obligation must be met. Plaintiffs contend that under the Least Cost Zoning Law, a public entity must "diligently" rezone upon the adoption of a new housing element so that the actual construction of affordable housing as contemplated by the zoning changes can be accomplished within the planning period.

Plaintiffs sought their writ of mandate on the first two causes of action through a noticed motion procedure in the court below. The City answered the petition and filed opposition to the requested relief. Before the court on the motion were, among other things, Gilroy's 2002 general plan, its adopted housing element (one component of the general plan); the accompanying Housing Background Report; portions of Gilroy's zoning ordinance; the then current version of the Department's Q's & A's, which contain its interpretations of statutory requirements; and written revisions, comments, and communications between Gilroy and the Department concerning the Department's recommendations and the City's efforts to satisfy the Department that the element substantially complied with the Housing Element Law.[16]

The trial court heard argument and then issued a written ruling denying the "Petition/Motion." The court's stated rationale in support of its ruling was that: "Gilroy's Housing Element substantially complies with the requirements set out in the Government Code. [(Hernandez v. City of Encinitas (1994)] 28 Cal.App.4th 1048, 1058 [33 Cal.Rptr.2d 875].)] Gilroy is not in violation of the Least Cost Zoning law. Gilroy is implementing its plan for Neighborhood Districts during the planning period." The parties later entered into a stipulation whereby the City would waive costs, plaintiffs would dismiss their remaining causes of action without prejudice, and a "final" judgment would be entered in favor of the City on the first two causes of action. The dismissal and judgment were later entered as contemplated by the stipulation. Plaintiffs then appealed from the "order denying their motion for writ of mandate . . . and from the final judgment . . . ."[17]

---

[16] It is not clear from the record whether the revisions that were forwarded to the Department were ever formally incorporated into Gilroy's 2002 adopted housing element.

[17] The City filed in this court a motion to dismiss the appeal for lack of appealability. The motion generally asserted that plaintiffs' voluntary dismissal of their third through eighth causes of action without prejudice to facilitate the entry of a "final" judgment on the first two causes of action violated the one final judgment rule since the dismissed causes of action

## DISCUSSION

### I. *Issues on Appeal*

The primary issue on appeal is whether Gilroy's 2002 housing element substantially complies with the version of the state Housing Element Law in effect in 2002. More specifically, the questions presented are whether Gilroy's 2002 housing element:

(1) contains an "inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites" in substantial compliance with section 65583, subdivision (a)(3);

(2) contains a program setting forth a five-year schedule of actions that Gilroy is undertaking or intends to undertake to "[i]dentify adequate sites which will be made available through appropriate zoning and development standards and with services and facilities . . . needed to facilitate and encourage the development of a variety of types of housing for all income levels in order to meet the community's [identified] housing goals . . ." in substantial compliance with former section 65583, subdivision (c)(1)(A); and

(3) if failing to provide an inventory of sites under section 65583, subdivision (a)(3) that identifies sufficient sites to accommodate the housing need for groups of all income levels, does the housing element nevertheless provide for "sufficient sites with zoning that permits . . . multifamily residential use by right, including density and development standards that could accommodate and facilitate the feasibility of housing for very low and low-income households" in substantial compliance with former section 65583, subdivision (c)(1)(A)(i).

The secondary issue on appeal concerns the question of Gilroy's compliance with the Least Cost Zoning Law—i.e., has the City "designate[d] and zone[d] sufficient vacant land . . . to meet housing needs for all income categories as identified in the housing element" in compliance with section 65913.1.

---

remained subject to revival. (See, e.g., *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 308–309 [63 Cal.Rptr.2d 74, 935 P.2d 781]; *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at pp. 743–744; *Don Jose's Restaurant, Inc. v. Truck Ins. Exchange* (1997) 53 Cal.App.4th 115, 116–119 [61 Cal.Rptr.2d 370]; *Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1427–1430 [77 Cal.Rptr.2d 574].)

We considered the motion and directed plaintiffs to stipulate either that the prior dismissal of the remaining causes of action was to be deemed with prejudice or that they unequivocally waived any right to a trial or hearing on these causes of action, otherwise the appeal would be dismissed. Plaintiffs having elected by written stipulation to unequivocally waive a trial or hearing on the dismissed causes of action, our appellate jurisdiction is preserved and we accordingly denied the motion to dismiss by separate order.

II. *Standard of Review*

*Challenge to the City's Housing Element*[18]

We have already addressed the standards applicable to the trial court's mandamus review of a challenge to the legal adequacy of a housing element under Code of Civil Procedure section 1085 and section 65587, subdivision (b). On appeal, we independently ascertain as a question of law whether the housing element at issue substantially complies with the requirements of the Housing Element Law, substantial compliance meaning " ' " 'actual compliance in respect to the substance essential to every reasonable objective of the statute,' as distinguished from 'mere technical imperfections of form.' " [Citation.]' " (*Buena Vista, supra,* 175 Cal.App.3d at p. 298; see *Camp v. Board of Supervisors, supra,* 123 Cal.App.3d at p. 348; *Black, supra,* 22 Cal.App.4th at p. 980.) In our independent review of the housing element's legal adequacy, we afford no deference to the trial court's conclusions. (*Garat v. City of Riverside, supra,* 2 Cal.App.4th at p. 292; *Buena Vista, supra,* at p. 298.)

On the other hand, a city's adoption of a housing element is a legislative enactment, something which is generally entitled to some deference. There is a presumption that the adopted element is valid and we do not in the course of our review evaluate the municipality's determination of policy. (*Garat v. City of Riverside, supra,* 2 Cal.App.4th at p. 292; *Buena Vista, supra,* 175 Cal.App.3d at p. 298; *Black, supra,* 22 Cal.App.4th at p. 980.) The burden is on the challenger to demonstrate that the housing element, and by extension the general plan, is inadequate. (*Garat v. City of Riverside, supra,* at p. 293.) If the municipality has substantially complied with statutory requirements, we will not interfere with its legislative action, unless that action was arbitrary, capricious, or entirely lacking in evidentiary support. (*Hoffmaster v. City of San Diego* (1997) 55 Cal.App.4th 1098, 1105–1106 [64 Cal.Rptr.2d 684] (*Hoffmaster*); *Hernandez v. City of Encinitas, supra,* 28 Cal.App.4th at p. 1059 (*Hernandez*); *Garat v. City of Riverside, supra,* at pp. 292–293; *Buena Vista, supra,* at p. 298.)

Accordingly, like the trial court, we do not review the merits of the housing element at issue or assess the wisdom of the municipality's determination of policy. (*Black, supra,* 22 Cal.App.4th at p. 980.) Nor do we judge whether the programs adopted by the locality are adequate to meet their stated objectives. (*Buena Vista, supra,* 175 Cal.App.3d at pp. 298, 306.) Our review thus comes down to independently determining whether the housing

---

[18] We address the proper standard of review on a challenge under the Least Cost Zoning Law at part III.B., *post.*

element at issue is in substantial compliance with applicable statutory requirements, i.e., does it contain the elements mandated by the statute.

The parties offer differing views on the weight we are to afford in the course of our review to the Department's interpretation of statutory requirements of the Housing Element Law, as reflected in its Q's & A's. Plaintiffs posit that judicial respect for the Department's interpretation of the Housing Element Law is mandated by general principles of administrative law under *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] (*Yamaha*), and that we should accordingly give great weight to the Department's "statements that (a) the inventory [required by section 65583, subdivision (a)(3)] must 'identify *specific* sites suitable for residential development,' not merely undifferentiated acreages; and (b) the identification of adequate sites [pursuant to former section 65583, subdivision (c)(1)(A)] 'must [occur] soon enough in the planning period to reasonably permit development during the planning period.' "

The City, on the other hand, argues that as a matter of law, no authority requires judicial deference to the Department's interpretation of the Housing Element Law and that the independent standard of judicial review which we apply under section 65587, subdivision (b), affirmatively precludes such deference.[19]

In *Yamaha*, the California Supreme Court addressed the question of the deference to be applied to a state agency's informal interpretation of a statute in contrast to that afforded to regulations adopted by an agency under quasi-legislative authority expressly delegated by the Legislature. While quasi-legislative regulations are of binding force as statements of the law, commanding judicial deference and receiving limited judicial review, an agency's informal interpretation of a statute is entitled to considerably less judicial deference, the courts being the constitutional arbiters of statutory

---

[19] More specifically, the City contends that we afford no deference to the Department's negative findings concerning Gilroy's 2002 housing element since: (1) the Department's Q's & A's are advisory only (§ 65585, subd. (a)); (2) a locality may adopt a housing element in spite of the Department's negative findings (§ 65585, subd. (f)(2)); and (3) the Legislature impliedly intended to afford no significance to a negative finding by the Department through its provision for a rebuttable presumption afforded to a positive finding with no parallel mention of any presumption to be afforded to a negative finding (§ 65589.3). These contentions focus on the effect of the Department's specific findings that Gilroy's 2002 housing element failed to substantially comply with the Housing Element Law and not the general weight to be afforded to the Department's interpretation of the law as expressed in its Q's & A's. While plaintiffs make much of this rather subtle distinction, it is one without a difference for our purposes. To the extent the Department found that Gilroy's housing element did not substantially comply with the Housing Element Law in the particular respects raised here, those findings are consistent with and rest on the Department's general interpretation of the law as expressed in its Q's & A's.

meaning. (*Yamaha, supra,* 19 Cal.4th at pp. 7–15.) " 'The standard for judicial review of agency interpretation of the law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Id.* at p. 8.) We accordingly take " 'ultimate responsibility for the construction of the statute, accord[ing] great weight and respect to the administrative construction. [Citation.]' " (*Id.* at p. 12.) But the extent of judicial weight to be afforded is necessarily contextual and "fundamentally *situational.* A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Ibid.*)

There are two categories of factors that are relevant to a court's assessment of the weight to be afforded to an agency's informal statutory interpretation. First, there are factors indicating a comparative interpretive advantage the agency has over the court due to, for example, the agency's authorship of the regulation at issue or the technical nature of the legal text under consideration. The second category includes factors indicating that the agency's interpretation of a rule is likely to be correct, such as the agency's adoption of a rule pursuant to the Administrative Procedure Act (§ 11340 et seq.) after notice and an opportunity for public comment, or its long-standing maintenance of the interpretation in question. (*Yamaha, supra,* 19 Cal.4th at p. 12.) A few of these factors favoring judicial deference are indeed present here. Still, the Department's informal interpretation of statutory requirements is in no way binding on us and the weight to which we afford it depends ultimately on our assessment of its reasonableness.

Moreover, as recognized by the Court of Appeal in *Buena Vista,* in determining the legal adequacy of a housing element, the roles of the Department and the courts differ. "The Department reviews not only to ensure the requirements of [section] 65583 are met, but also to make suggestions for improvements. . . . However, a court looks only to ensure the requirements of [section] 65583 are met and not whether, in the court's judgment, the programs adopted are adequate to meet their objectives or are the programs which the court thinks ought to be there. While this court may be of the opinion City should adopt Department's recommendations, *the Legislature has stated its recommendations are advisory.* (§ 65585, subd. (a).)" (*Buena Vista, supra,* 175 Cal.App.3d at p. 306.) We think these distinct roles ought to be reflected in the weight we afford to the Department's statutory interpretation of the Housing Element Law, as reflected in its Q's & A's.

While we acknowledge that the Department's interpretation of the Housing Element Law's legal meaning and effect is the product of the Department

having regularly dealt with these statutes falling within its administrative jurisdiction, we still must exercise our independent duty to state the meaning of the statutes at issue here, giving consideration to the Department's views. "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.]" (*Yamaha, supra,* 19 Cal.4th at pp. 7–8.) Thus, the weight we afford here to the Department's Q's & A's is in accordance with our view of the substantive merits of the Department's statutory interpretation. And to the extent plaintiffs' contentions mirror the Department's interpretation of relevant aspects of the Housing Element Law in the Q's & A's, our analysis necessarily considers those merits.

### III. Analysis

A. *Gilroy's Adopted 2002 Housing Element Substantially Complies with the Requirements of the Housing Element Law As Previously in Effect*

1. *Section 65583, subdivision (a)(3)*

Section 65583 initially provides: "The housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, and mobilehomes, and shall make adequate provision for the existing and projected needs of all economic segments of the community." Subdivision (a)(3) goes on to require that the housing element contain "[a]n assessment of housing needs and an inventory of resources and constraints relevant to the meeting of these needs. The assessment and inventory shall include . . . [¶] . . . [¶] . . . [a]n *inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites.*" (§ 65583, subd. (a)(3), italics added.)

The gist of plaintiffs' primary contention is that Gilroy's 2002 housing element failed to even substantially comply with section 65583, subdivision (a)(3), because the element, while providing an aggregate inventory of what the City identified as vacant sites and sites potentially available for

development, did not identify any specific sites or provide analysis of zoning and facilities in relation to those identified specific sites. This contention rests on the further assertion that the language of the statute, its interpretation by the Department in the Q's & A's, and case law all mandated a statutory construction of this subdivision that required a site-specific inventory of land suitable for development, accompanied by site-specific analysis.

The City, for its part, contends that its housing element substantially complied with the statute because at the time, there was no requirement that the inventory identify *specific* sites both suitable for residential development and available to meet the housing needs and, thus, an aggregate listing or summary of vacant sites and sites having potential for redevelopment with general analysis of zoning and facilities was all that was required.

■ We agree with the City that prior to amendments to the Housing Element Law in 2004, there was no legislative enunciation of the level of detail or specific information required in the land inventory, other than what the language of former section 65583 itself provided. As we read the statute, neither this subdivision nor any other section of the Housing Element Law included a requirement that the land inventory comprise more than a listing of aggregate acreages in the various categories or that it be parcel or site specific. The word "inventory," as used in the general sense employed in the statute does not necessarily imply, as plaintiffs would have it, that a detailed item-by-item list is called for. "Stock," as in the quantity of materials on hand, is all that the land inventory in this context spoke to, in the absence of a statutory directive for further or more detailed criteria.[20] The statute thus required the inventory to include "vacant sites and sites having potential for redevelopment," but did not require it to specifically identify each of such sites. (§ 65583, subd. (a)(3).) Given the absence of a site-specific requirement for the land inventory itself, the further analysis "of the relationship of zoning and public facilities and services to these sites," also called for by this subdivision likewise did not require site specificity. (*Ibid.*) Instead, prior to the 2004 amendments to the Housing Element Law, substantial compliance with section 65583, subdivision (a)(3), required only general analysis of zoning and public facilities to the inventoried sites, as catalogued or listed in the aggregate.

Our reading of what section 65583, subdivision (a)(3), previously required of the land inventory and accompanying analysis is confirmed by the 2004 statutory amendments to the Housing Element Law, effective 2005, which,

---

[20] Merriam-Webster's Collegiate Dictionary includes both definitions among several general meanings of the word "inventory." As the parties point out, the word can mean "an itemized list of current assets" or "the quantity of goods or materials on hand: stock." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 615, col. 1.)

according to the Legislative Counsel's Digest, would "*revise* the criteria for the inventory of sites." (Stats. 2004, ch. 724, 2d par.; Legis. Counsel's Dig., Assem. Bill No. 2348 (2003–2004 Reg. Sess.), italics added.) Among these statutory changes is the addition of section 65583.2, which includes newly detailed requirements for the land inventory mandated by section 65583, subdivision (a)(3). According to the new statute, the inventory must now include a "listing of properties by parcel number or other unique reference," "[t]he size of each property" and the "general plan designation and zoning of each property," "[a] map that shows the location of the sites included in the inventory," and for nonvacant sites, "a description of the existing use of each property." (§ 65583.2, subd. (b)(1), (2), (3), (7).)

This new section also makes clear that the general descriptions of "any environmental constraints to the development of housing within the jurisdiction" and "existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities," both of which are now specifically required for the inventory, need not "be identified on a site-specific basis." (§ 65583.2, subd. (b)(4) & (5).) Thus, the new statute, while for the first time mandating an identification of the designated zoning of each site within the inventory, expressly does not require this same specificity with respect to public facilities and services. We conclude from this that the analysis of these infrastructure issues, as previously required under section 65583, subdivision (a)(3), likewise was not required to be site specific.

Plaintiffs characterize the 2004 statutory changes to the Housing Element Law as "clarifying" amendments, and they point to two Assembly Committee reports relating to the proposed amendments to suggest that the land inventory mandated by section 65583, subdivision (a)(3), the text of which remains the same, has always required site specificity. In comments, both reports say that then current or existing law (i.e., pre-2005) required "housing elements to include a land inventory *identifying sites* suitable for residential development by income level." (Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2348 (2003–2004 Reg. Sess.) as amended April 16, 2004, p. 2, italics added; Assem. Com. on Local Government, Analysis of Assem. Bill No. 2348 (2003–2004 Reg. Sess.) as amended April 16, 2004, p. 2.)[21] However, both reports, like the Legislative Counsel's Digest, also recognize that many of the statutory amendments proposed by Assembly Bill No. 2348 (2003–2004 Reg. Sess.) indeed would constitute changes to the law and that such changes would impose uniform and specific content requirements for the land inventory for the first time.

---

[21] We have taken judicial notice of these reports upon plaintiffs' motion.

In any event, the statutory amendments themselves do not state that they are merely declarative of existing law. And even when legislative amendments do so state, a later Legislature's expression that statutory amendments are only intended to clarify what an earlier Legislature enacted are neither binding nor conclusive on courts, which are ultimately vested with the task of statutory interpretation. Coming at a time before our high court's definitive interpretation of a particular statute, such a legislative expression is merely entitled to "consideration" as a factor in a court's construction of the statute.[22] (*Carter v. California Dept. of Veterans Affairs, supra,* 38 Cal.4th at p. 922.) A court engaged in statutory construction looks to "all pertinent circumstances and considerations in deciding whether an amendment is a modification or clarification of a statute." (*People v. Franklin* (1999) 20 Cal.4th 249, 256 [84 Cal.Rptr.2d 241, 975 P.2d 30].) And particularly when there is no definitive "clarifying" expression by the Legislature in the amendments themselves, we will presume that a substantial or material statutory change, as occurred here by the addition of section 65583.2 alone, bespeaks legislative intention to change, and not just clarify, the law. (*Reidy v. City and County of San Francisco* (2004) 123 Cal.App.4th 580, 592 [19 Cal.Rptr.3d 894]; *Garrett v. Young* (2003) 109 Cal.App.4th 1393, 1404–1405 [1 Cal.Rptr.3d 134].)

There is a dearth of case law construing the inventory requirement of section 65583, subdivision (a)(3), either before or after the 2004 amendments to the Housing Element Law. Plaintiffs cite *Hoffmaster* as authority for the proposition that this part of the statute has always required a site-specific land inventory. But the court in *Hoffmaster* did not so hold. That case construed only the adequate sites requirement of former section 65583, subdivision (c)(1), as the land inventory requirement of subdivision (a)(3) was not in issue. In contrasting what it viewed as the differing specificity mandates between these two subdivisions with the adequate site requirement commanding more, the *Hoffmaster* court even referred to the land inventory as "simply that which is *generally required* under section 65583, subdivision (a)(3)." (*Hoffmaster, supra,* 55 Cal.App.4th at p. 1112, italics added, fn. omitted.) Plaintiffs' reliance on *Hoffmaster* as authority for a pre-2005 site-specific inventory requirement under section 65583, subdivision (a)(3), is therefore misplaced.

The City, in turn, relies on *Buena Vista* and *Hernandez* for its contention that section 65583, subdivision (a)(3), does not require the land inventory to be site specific. As in *Hoffmaster*, the issues before the court in *Buena Vista*

---

[22] The Legislature does not even have the power to declare later amendments to be "clarifying" of existing law after the Supreme Court has " 'finally and definitively' " interpreted a statute. (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 [44 Cal.Rptr.3d 223, 135 P.3d 637].)

did not involve the land inventory or judicial construction of the requirements of section 65583, subdivision (a)(3). In fact, all the issues raised in *Buena Vista* involved the various requirements of the then current iteration of section 65583, subdivision (c). (*Buena Vista, supra,* 175 Cal.App.3d at pp. 298–299.)

The court in *Hernandez* was dealing with a challenge to the City of Encinitas's housing element that asserted, among other things, that the element did not "include an inventory of land as required by section 65583(a)(3) . . . ." (*Hernandez, supra,* 28 Cal.App.4th at p. 1062.) The challenge more specifically contended that the subject housing element, while addressing vacant and underdeveloped sites, still only amounted to " '[a] simpl[e] catalogu[e of] the vacant acres already zoned residential (2434 acres),' and there [had been] no 'manifest attempt' to identify otherwise suitable land such as vacant or 'infill' sites presently zoned commercial and no consideration given to mixed use potential, such as, for example, rental apartments." (*Ibid.*) Based on the court's discussion of the contents of the Encinitas housing element, we cannot tell if that element included an inventory that was site specific. It appears, as plaintiffs contend, that the challenge in *Hernandez* to the land inventory was not based on its lack of site specificity per se, but, instead, on its incompleteness. Still, the characterization by the *Hernandez* plaintiffs of the Encinitas inventory as a mere " 'catalogu[e of] the vacant acres already zoned residential' " at least suggests criticism for a lack of site specificity. (*Ibid.*) And in upholding the trial court's rejection of the challenge to the housing element, the *Hernandez* court referred to and discussed what were apparently only generalized descriptions in the land inventory. These facts lead us to infer that the inventory in *Hernandez* was not site specific.[23] In any event, the court did not expressly decide that the land inventory required by section 65583, subdivision (a)(3), need not be site specific. It did not even discuss this particular question in its resolution of the case.

Despite not having the benefit of another court's construction of the land inventory requirement of section 65583, subdivision (a)(3), based on both the language of the statute and the significant 2004 Housing Element Law amendments affecting it, we conclude that prior to the 2004 amendments, neither the land inventory, nor its accompanying analysis, was required to be

---

[23] The court observed that "there is a substantial portion of the housing element devoted to the subject of vacant sites and underdeveloped sites, complete with figures, tables and word descriptions." (*Hernandez, supra,* 28 Cal.App.4th at p. 1062.) It also noted that the inventory included discussion of constraints to development, efforts at "recycling" of sites to higher density units, and a proposal for mixed-use development in commercial districts that would yield a quantified number of affordable housing units to lower income households. (*Id.* at pp. 1062–1063.) It seems to us that Gilroy's land inventory, as it appears in the Housing Background Report, has many of these same features, likewise presented in a format of tables and general discussion rather than site-specific analysis.

site specific. In so concluding, we acknowledge plaintiffs' overarching point that without site specificity in the land inventory, the ultimate goals of the Housing Element Law of promoting and increasing the available stock of affordable housing in this state are more difficult to achieve. We also recognize as a practical matter that meaningful enforcement of the Housing Element Law, in all its component parts, may have been undermined without, among other things, a requirement of more specificity in the land inventory mandated by section 65583, subdivision (a)(3).[24] The Legislature, whose function it is to write the statutes, has apparently recognized this fact too, prompting its enactment of the 2004 amendments to the Housing Element Law, which in part address, in significant detail, the specificity of the land inventory. But the fact remains that in this case, we are dealing with the state of the Housing Element Law before those amendments, and we must construe, rather than rewrite, the statutes as we see them.

In light of our construction of section 65583, subdivision (a)(3), we now examine Gilroy's land inventory and assessment, as provided in its 2002 housing element through the Housing Background Report as revised December 2001, to determine whether Gilroy substantially complied with the then applicable legal requirements of the statute.[25] The parties do not dispute that the housing element contains an "assessment of housing needs" as required by section 65583, subdivision (a). But as noted, the statute goes on to require "an inventory of resources and constraints relevant to the meeting of these needs," which includes an "inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to

---

[24] This is because a site-specific land inventory facilitates the assessment whether a locality's housing element complies with the "adequate sites" requirement of former section 65583, subdivision (c)(1)(A). This conclusion explains the Department's position, as reflected in its June 2001 Q's & A's, that even under prior law, section 65583, subdivision (a)(3), required localities to prepare a land inventory and analysis of specific sites so that it could be determined what, if any, additional actions were needed under former section 65583, subdivision (c)(1), in order to provide sufficient adequate sites to accommodate the locality's fair share housing needs at all income levels.

[25] The courts in both *Buena Vista* and *Hoffmaster* suggested, if not concluded, that the requirements of the pre-2005 Housing Element Law could be satisfied by reference to materials or documents not intrinsically a part of the housing element itself. (*Buena Vista, supra*, 175 Cal.App.3d at p. 301 ["While nowhere in the housing element itself is found a provision of specific sites for mobilehomes, rental housing or factory-built housing, it appears these designations may be in the detailed community plans which are referred to in City's housing element."]; *Hoffmaster, supra*, 55 Cal.App.4th at p. 1114 ["Available sites should be officially designated and publicized, *preferably* in the housing element, . . ." (Italics added.)].) Accordingly, there is precedent for our reliance here on extrinsic materials, such as Gilroy's Housing Background Report, to determine substantial compliance. Our further references to Gilroy's land inventory therefore encompass the Housing Background Report as well.

these sites." (§ 65583, subd. (a)(3).) Based on the parties' opposing interpretations of this latter language, an issue we have resolved in the City's favor, they dispute whether the element substantially complies with it.[26]

Section 7 of the Housing Background Report, entitled "Development Potential and Evaluation of Constraints," provides an inventory and discussion of aggregated vacant sites and sites having potential for redevelopment. This includes a narrative review, which acknowledges a shortage of already zoned land within the city limits for the development of higher density housing, and a table (7-1). The table "summarizes the vacant residentially zoned lands in the City based upon (1) an inventory of vacant lands and the City's current zoning; and (2) additional lands to be designated for higher density development based on implementation of the Neighborhood Districts[27]and rezoning based on the Land Use Plan Map of the Draft General Plan. An update of the Zoning Map and Zoning Ordinance (Action 1.A) and the Neighborhood Districts Implementation Strategy (Action 1.C) are identified as two of the General Plan's highest priority items in Chapter 10 of the Draft General Plan . . . ."

The table indicates that there had been 43 vacant acres already zoned R3, the second highest density designation, and that 48 additional acres would be added to this zoning category as a result of rezoning, for a total of 91 vacant acres zoned R3 that would potentially yield 1456 total housing units. The table further indicates that there had been zero vacant acres already zoned R4, the highest density designation, and that 39 additional vacant acres would be added to this zoning category as a result of rezoning, potentially yielding 1170 high-density housing units.[28] In terms of sheer numbers, this is purportedly and facially sufficient to accommodate Gilroy's remaining allocated

---

[26] Accordingly, the parties do not dispute the factual contents of the land inventory, just whether those contents substantially comply with statutory requirements, as the parties interpret them.

[27] The "Neighborhood Districts" plan is a new program being incorporated into land use planning in Gilroy. It is a concept providing for mixed use development and a new density designation involving multiple density categories in a single area. This is a move away from the more traditional designations of a single kind of density—low, medium, or high—in a single area that is thought to have resulted in negative planning effects. Gilroy's Neighborhood Districts plan is a significant component of its general plan, which contains action items relating to it, and it is one invoked by the City, along with updating of zoning, as a means to achieve its housing goals and needs once areas are rezoned. These goals and needs include those relating to affordable housing by providing for minimum and targeted mixes of densities that will, it is suggested, lead to more development of lower income housing—enough to alone accommodate the City's fair share housing needs in the lower income categories.

[28] Higher density zoning generally correlates to the lower income categories of housing. (See § 65583.2, subd. (c)(3)(B), adopted as part of the 2004 revisions to the Housing Element Law.)

ABAG fair share of low- and very-low-income housing units for the planning period—882—and then some.[29]

As for infrastructure analysis of the vacant lands available for residential development as shown in table 7-1, the Housing Background Report notes that "all are contained within the City limits and therefore within the City's Urban Service Area. While the full range of services and facilities do not currently exist in some of the larger planned areas for residential development (especially in the southeast portion of the City), the City and other agencies (e.g., Gilroy Unified School District) have master planned the entire area and will be implementing necessary facility and infrastructure improvements to support future residential development in these areas."

The Housing Background Report goes on to discuss a number of "opportunities for redevelopment of under-utilized properties." It further addresses additional mechanisms to increase "Multiple Family Development Potential," including through the update of the Gilroy zoning map, implementation of the Neighborhood Districts program, encouragement of mixed use development in the downtown area, the identification and encouragement of infill development, development of accessory units, and the establishment of minimum density limits in each residential land use category, all of which are projected to yield additional medium- and high-density housing units.

Finally, the Housing Background Report notes that in the past, "infrastructure issues—specifically limited wastewater treatment capacity—ha[ve] been an obstacle to development in Gilroy, resulting in a significant reduction in housing development activity in the 1980s and early 1990s. Since completion of the new wastewater treatment facility, development activity has surged. [¶] At this time and for the foreseeable future, there are no infrastructure constraint issues that will limit housing development. However, infrastructure issues continue to be a major concern for community residents and city officials, particularly the timing of infrastructure, facility and service improvements with new development. These concerns are reflected in the General Plan policies, the City's and School District's development impact fees, and the Residential Development Ordinance—all of which attempt to manage the rate and location of growth; ensure that new development helps pay for the costs of new infrastructure needed to support it; and ensure that levels of service are maintained as new development is completed." Under the next heading entitled "Potential Government Constraints," the Housing Background Report goes on to discuss these impact fees and the residential development ordinance in greater detail.

---

[29] In view of these numbers, we need not resolve the disputed issue whether the R3 zoning density designation can ever accommodate low- and lower income housing units. The City argues that areas zoned R3 can indeed accommodate these income categories, thus reducing the corresponding ABAG fair share need to that extent, while plaintiffs deny this.

 We conclude that these portions of the City's Housing Background Report, notwithstanding the lack of site specificity, demonstrate substantial compliance with section 65583, subdivision (a)(3), of the Housing Element Law as it existed prior to the 2004 amendments.[30] From the Housing Background Report, one can compare the regional housing need for the planning period by affordability with the residential development capacity under then current zoning to determine whether additional programs were needed to address the entire regional need by income level. To conclude otherwise based on petitioners' challenges under this subdivision would be to invalidate the housing element based on its merits. This would impermissibly exceed the scope of our judicial review. (*Hernandez, supra,* 28 Cal.App.4th at p. 1068; *Buena Vista, supra,* 175 Cal.App.3d at p. 302.)

### 2. *Former section 65583, subdivision (c)(1)(A)*

Former section 65583, subdivision (c), provided that the housing element shall contain a "program which sets forth a five-year schedule of actions the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element . . . . In order to make adequate provision for the housing needs of all economic segments of the community, the program shall do all of the following: [¶] (1)(A) *Identify adequate sites which will be made available through appropriate zoning and development standards and with services and facilities,* including sewage collection and treatment, domestic water supply, and septic tanks and wells, *needed to facilitate and encourage the development of a variety of types of housing for all income levels,* including multifamily rental housing, factory-built housing, mobilehomes, housing for agricultural employees, emergency shelters, and transitional housing in order to meet *the community's housing goals as identified in subdivision (b).*"[31] (Stats. 2001, ch. 671, § 2,

---

[30] The record reveals that in 1998, the City prepared a vacant and underutilized land survey, or "database," as part of the general plan update process. The survey was presented in the form of a spreadsheet and a map of the planning area. This land use database was updated in 2001 and used for the preparation of the 2002 draft housing element. This update process involved revisions to the land use database, which provided "necessary parcel-level data" for preparation of the draft and the City's later 2003 comments in response to the Department's compliance review thereof. If site-specific information was then available, it is not clear why this information never made it into the 2002 housing element or the Housing Background Report or why the City did not later revise these documents to include this information.

[31] Section 65583, subdivision (c)(1), now reads: The program shall "[i]dentify *actions* that will be taken to make sites available *during the planning period* of the general plan with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the *regional housing need* for each income level that could not be accommodated *on sites identified in the inventory completed pursuant to paragraph (3) of subdivision (a)* without rezoning . . . . Sites shall be identified as needed to facilitate and encourage the development of a variety of types of housing for all income levels, . . . [¶] (A) Where the inventory of sites, pursuant to paragraph (3) of subdivision (a),

italics added.) Section 65583, subdivision (b)(1), in turn provided, as it still does, that the housing element shall contain a "statement of the community's *goals, quantified objectives, and policies* relative to the maintenance, preservation, improvement, and development of housing." (Italics added.)

Plaintiffs' challenge to Gilroy's 2002 housing element under former section 65583, subdivision (c)(1)(A), comes down to the contention that the element, lacking a site-specific inventory, necessarily also lacked a program that identified adequate and specific sites to meet the regional housing need for the low- and lower income categories in enough time to permit development of such sites during the planning period. Relying principally on *Hoffmaster*, plaintiffs urge that a site is only " 'adequate' " if it is " 'available for immediate development' of housing of the kind needed" and if it is a "site on which that kind of housing can feasibly be built." (Italics omitted.) They contend that without a site-specific inventory containing information about the zoning, location, size, and existing use of each site, at a minimum, one cannot know if "adequate" sites have been identified in substantial compliance with former section 65583, subdivision (c)(1)(A). Without this knowledge, the argument goes, it is impossible to determine if government programs addressing zoning and infrastructure relative to specific sites are necessary under this subdivision in order to, within the planning period, meet regional housing needs at each income level. This argument is entirely dependent on a pre-2005 interpretation of section 65583, subdivision (a)(3), mandating a site-specific inventory—an interpretation we have rejected. Finally with respect to former section 65583, subdivision (c)(1)(A), plaintiffs contend that the "adequate sites" provision further required that for each of the specifically identified sites, the program must have included a statement of the additional government actions the City will take to make that site immediately available.

The City, for its part, contends that the adequate sites requirement of former section 65583, subdivision (c)(1)(A), contemplated that a site may be adequate without being presently or immediately available for development.

does not identify adequate sites to accommodate the *need* for groups of all household income levels pursuant to Section 65584, the program shall identify sites that can be developed for housing *within the planning period* pursuant to subdivision (h) of Section 65583.2." (Italics added.)

Thus, under current law, this subdivision now requires site identification to accommodate the *regional housing need* as opposed to *housing goals* and the program actions must be taken *during the planning period* as opposed to simply being in accordance with *a five-year schedule of actions.* By its reference to regional housing needs, the subdivision now also expressly works in tandem with the inventory now required by section 65583, subdivision (a)(3), which under section 65583.2 is now required to be site specific. Section 65583, subdivision (c)'s prior reference to meeting housing goals in the identification of sites, and not needs, suggested, perhaps inadvertently, that these two subdivisions were directed at different housing objectives, or at least were not necessarily tied together.

In other words, sites which are suitable for development may still be "adequate" even though zoning and public service constraints to development still exist. Under the City's interpretation of the former subdivision, all that was required to substantially comply with it was inclusion in the housing element of a plan to make sites available that are suitable for development by removal or amelioration of these constraints.

We conclude that plaintiffs overreach in their interpretation of former section 65583, subdivision (c)(1)(A). The statutory language did not require that sites be immediately available for development in order for them to be "adequate." Nor did it require a showing of the feasibility of development on individual sites.[32] Nor did it require that actions designed to ameliorate developmental or zoning constraints be scheduled to occur at any particular point early in the planning period so that actual development could be completed within that period. Instead, the statute simply required a statement of administrative plans scheduled to occur over a five-year period—i.e., a program—to implement the policies, goals, and quantified objectives of the housing element. The program was merely required to identify "adequate sites which *will be made available* through appropriate zoning and development standards and with services and facilities needed to facilitate and encourage the development of a variety of types of housing for all income levels . . . in order to meet the [City's] housing goals . . . ." (Former § 65583, subd. (c)(1)(A), italics added.)

The result in *Buena Vista* supports our conclusion. The court there rejected a challenge to a housing element on the basis that it did not meet the "adequate sites" requirement of former section 65583, subdivision (c)(1)(A). The court did so even though the element had not identified particular sites that were being made available for certain types of housing and as to that matter, the program had indicated only that city-owned land " 'may be offered' " to the public and nonprofit housing agencies for development of affordable housing. (*Buena Vista, supra,* 175 Cal.App.3d at pp. 300–301.) The element stated: " 'This will continue the program which has committed about 226 acres of City-owned land valued in excess of $22.9 million to production of over 1,700 affordable units.' " (*Id.* at p. 300.) The Department, in declining to certify that the housing element was in substantial compliance

---

[32] To the extent *Hoffmaster* supports plaintiffs' interpretation of former section 65583, subdivision (c)(1)(A), we disagree with that case, which defers to the Department's Q's & A's for its statutory construction. (*Hoffmaster, supra,* 55 Cal.App.4th at pp. 1110–1114.) Moreover, *Hoffmaster's* statement that "for identification to be meaningful, it must necessarily be specific" is arguably dictum. (*Id.* at p. 1114.) The court's holding in fact did not turn on the identification of the sites (the city had provided detailed maps showing their precise location) but on their availability for development. (*Id.* at pp. 1112–1113.)

with the law, asserted that the program did not evidence " 'a firm commitment to implementation' " and that there was " 'no indication of how much land will be made available, its zoning, or dwelling-unit capacity.' " (*Ibid.*)

The *Buena Vista* court upheld the City's housing element in spite of the Department's conclusions about its legal deficiencies. In so doing, the court noted that the "City states [that] San Diego is divided into 40 subareas each with its own community plan and City has set forth the capacity of each subarea community plan and the capacity remaining for further residential development. *The capacity remaining exceeds City's housing needs for the five-year time span contemplated by the element.*" (*Buena Vista, supra,* 175 Cal.App.3d at pp. 300–301, italics added.) The court further noted in finding substantial compliance with the statute that the City had "developed a computer program to monitor development projects throughout the development process and therefore [could] obtain 'a picture of current patterns and a one- to three-year look into the future.' " (*Id.* at p. 301.)

Thus, the bases of the court's finding of substantial compliance with the "adequate sites" requirement under the former version of the statute were the kinds of statements in the housing element that fell well short of plaintiffs' interpretation of the same requirement here. The *Buena Vista* court was satisfied with a general indication in the housing element that site development capacity exceeded housing needs and that the City had developed a program to monitor the development process over the next three years.

The court in *Hernandez* likewise rejected a challenge to a housing element under former section 65583, subdivision (c)(1)(A). There, the plaintiffs contended that the City had failed to identify adequate sites for low- and moderate-income housing. The court observed that the housing element's discussion, tables, and figures under different categories of sites disclosed "ample land site identification applicable to the various categories of housing needs. The housing element includes programs in each of the categories listed in [former] section 65583[, subdivision ](c)(1)." (*Hernandez, supra,* 28 Cal.App.4th at p. 1067.) This, the court found, substantially complied with the "adequate sites" requirement. Notably, the court did not delve into the accuracy of the information given or analyze whether or when the programs in each category would yield the desired site development. "The petitioners' argument about the nonworkability of the housing element's facts and figures is a pure attack on the merits of this aspect of the plan based on an [expert's] opinion the court was under no obligation to accept." (*Id.* at p. 1068.)

Thus, *Hernandez* too interpreted former section 65583, subdivision (c)(1)(A), in a far more lenient manner than that urged by plaintiffs here. Indeed, plaintiffs' construction of the former statute would impose on the

City stringent requirements that appeared nowhere in the text, or in any other part of the Housing Element Law in place when the 2002 housing element was adopted.

We discern from Gilroy's housing element that its "quantified objectives" were to meet the unmet regional housing need.[33] In terms of this objective, we see that the element, as shown through the Housing Background Report—and as expressed in terms of quantified, potentially developable units in the various zoning density categories[34]—facially reflects that the City had the ability to accommodate the ABAG unmet total regional housing need by reference to vacant acres that had already been residentially zoned. (See Housing Background Report, table 7-1.) In isolating the unmet very-low- and low-income regional housing need—the subject of plaintiffs' challenge here—the City expressed its ability to accommodate this strata by resort to lands to be rezoned.[35]

As the City points out, the report goes on to articulate various programs and action items that are a part of or consistent with the general plan and that are intended to result in the projected rezoning and the development of sufficient multifamily, high-density, affordable housing units, including implementation of the Neighborhood Districts plan, so as to satisfy the unmet regional housing need for low- and very-low-income families.

Based on this information and these programs and action items, we conclude that the City substantially complied with the requirements of former section 65583, subdivision (c)(1)(A), to provide "adequate sites." While the City could have offered more specificity, and while the element does not express that its programs and action items will yield the desired results soon enough in the planning period to permit full development within that period,

---

[33] Gilroy's quantified objectives don't expressly state this. But they do imply it because the unmet regional housing needs are what are quantified against the "total number of units possible." The housing "goals" are stated in only general narrative terms and not in terms of quantified numbers. These goals include to incorporate "[e]ffective programs that respond to residents' housing needs . . . ." The "policies" are also stated in narrative and not quantified terms and they include the policy to "establish relationships, continue participation in Countywide housing assistance programs, and collaborate with other public agencies and non-profit housing sponsors in the use of available programs to provide lower-cost housing in Gilroy." As to the legal obligation of a locality to meet its stated housing needs and quantified objectives, "we note [that] identified housing needs, like quantified objectives, are simply goals, not mandated acts. [Citation.]" (*Hoffmaster, supra*, 55 Cal.App.4th at p. 1109, fn. 7.)

[34] These include those vacant acres already zoned and those to be rezoned "through Action 1.A of the Draft General Plan and implementation of the Neighborhood Districts land use designation (based on the minimum percent mix identified in the Draft General Plan)." (See Housing Background Report, table 7-1, p. 28.)

[35] Here we assume in plaintiffs' favor that such need could only be accommodated by acreage to be zoned R4.

these were not required for substantial compliance with the statute. We view plaintiffs' many attacks on the housing element and its programs (some specifically raised only in the reply brief) as amounting to "argument about the nonworkability of the housing element's facts and figures" and a "pure attack on the merits of the plan." (*Hernandez, supra,* 28 Cal.App.4th at p. 1068.)

### 3. *Former section 65583, subdivision (c)(1)(A)(i)*

Former section 65583, subdivision (c)(1)(A)(i), went on to provide that "[w]here the inventory of sites, pursuant to paragraph (3) of subdivision (a), does not identify adequate sites to accommodate the need for groups of all household income levels pursuant to Section 65584, the program shall provide for sufficient sites with zoning that permits owner-occupied and rental multifamily residential use by right, including density and development standards that could accommodate and facilitate the feasibility of housing for very low and low-income households."[36] Thus, a locality need not have satisfied the requirements of this subdivision unless it had failed to provide a land inventory under section 65583, subdivision (a)(3) that provided for adequate sites to meet the housing need for all income levels.

Following their contentions that the land inventory referred to in Gilroy's 2002 housing element failed to meet the requirements of section 65583, subdivision (a)(3), and that the element further failed to identify adequate sites under former section 65583, subdivision (c)(1)(A), plaintiffs further contend that Gilroy was consequently required to provide multifamily "by right" sites under former section 65583, subdivision (c)(1)(A)(i), and that it failed to do so.[37] The City contends that it did comply with any obligation to provide "by right" sites.

Having concluded that Gilroy's 2002 housing element substantially complied with section 65583, subdivision (a)(3), of the Housing Element Law then in effect, we need not, and therefore do not, decide whether Gilroy also complied with former section 65583, subdivision (c)(1)(A)(i).

### B. *Gilroy Did Not Violate the Least Cost Zoning Law*

As noted, section 65913.1 is part of the Least Cost Zoning Law. It states in relevant part that "[i]n exercising its authority to zone for land uses and *in*

---

[36] The requirements of this former subdivision have been restated and subsumed in current subdivision (c)(1)(A) of section 65583 and section 65583.2, subdivisions (h) and (i).

[37] "Use by right" meant that the "use [did] not require a conditional use permit, except when the proposed project [was] a mixed-use project involving both commercial or industrial uses and residential uses." (Former § 65583, subd. (c)(1)(A)(ii)(B); see now § 65583.2, subd. (i).)

*revising its housing element* . . . , a city, county, or city and county shall *designate and zone sufficient vacant land for residential use with appropriate standards*, in relation to zoning for nonresidential use, and in relation to growth projections of the general plan *to meet housing needs for all income categories as identified in the housing element of the general plan.*"[38] (§ 65913.1, subd. (a), italics added.) The purpose of the Least Cost Zoning Law "is to encourage local governments to approve needed and sound housing developments that will alleviate the 'severe shortage' of affordable housing for low and moderate income families." (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1260 [2 Cal.Rptr.3d 739].)

The parties dispute the standard of review that we apply on appeal from the trial court's denial of plaintiffs' Least Cost Zoning Law challenge. Plaintiffs contend that the issue of Gilroy's compliance with the Least Cost Zoning Law is a question of law subject to our de novo review because there are no substantial evidentiary disputes. But we agree with the City that the challenge here is primarily to Gilroy's rezoning efforts pursuant to its policies and programs set forth in the general plan, of which the housing element is a part, and the City's zoning ordinance. These matters constitute legislative enactments. (§§ 65301.5, 65850.) As such, they are presumed to be valid and "a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review the merits of a local government's policy decisions. [Citation.] Judicial review of a legislative act under Code of Civil Procedure section 1085 is limited to determining whether the public agency's action was arbitrary, capricious, entirely without evidentiary support, or procedurally unfair. [Citations.]" (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195 [24 Cal.Rptr.3d 543].) Whether an action finds evidentiary support in the record is measured by the substantial evidence test. (*Taylor Bus Service, Inc. v. San Diego Bd. of Education* (1987) 195 Cal.App.3d 1331, 1340 [241 Cal.Rptr. 379].)

Plaintiffs contend that the Least Cost Zoning Law required the City to take action to actually rezone a sufficient supply of adequate sites to meet the City's lower income share of need and that this action was required to have

---

[38] " 'Appropriate standards' means densities and requirements with respect to minimum floor areas, building setbacks, rear and side yards, parking, the percentage of a lot that may be occupied by a structure, amenities, and other requirements imposed on residential lots pursuant to the zoning authority which contribute significantly to the economic feasibility of producing housing at the lowest possible cost given economic and environmental factors, the public health and safety, and the need to facilitate the development of housing affordable to persons and families of low or moderate income, as defined in Section 50093 of the Health and Safety Code, and to persons and families of lower income, as defined in Section 50079.5 of the Health and Safety Code." (§ 65913.1, subd. (a)(1).)

been completed within "a reasonably prompt time after the December 2001 deadline for revising [the City's] housing element." The City responds that the Least Cost Zoning Law does not require immediate rezoning upon revision of the housing element, that such a requirement would conflict with the five-year planning periods contemplated by the Housing Element Law, and that the element's plan for meeting its share of the regional housing need through rezoning and implementation of the Neighborhood Districts plan is all that was required to comply with section 65913.1. Echoing their challenge under the Housing Element Law, plaintiffs reply that implementation of the Neighborhood Districts plan cannot constitute compliance with the Least Cost Zoning Law because it is only a plan to " '[c]onvene a Task Force,' " not a program "to zone sites for higher density housing."

██ We conclude that the City has the better argument. First, there is no express requirement in section 65913.1 that a locality immediately rezone upon adoption of a revised housing element. Second, even as revised, the Housing Element Law, which works in tandem with the Least Cost Zoning Law, does not require immediate action and permits a locality to act within the planning period to meet regional housing needs. (§§ 65583, subd. (c), 65913, subd. (a)(3).) Third, as we have already concluded, under the Housing Element Law then in effect, Gilroy's housing element designated sufficient rezoned land, through its programs and actions to update zoning and implement the Neighborhood Districts plan, to increase affordable housing and to satisfy the regional housing need for the low- and lower income categories. Plaintiffs have not shown these legislative actions to have been arbitrary, capricious, or entirely without evidentiary support.

Fourth, there is substantial evidence in the record of the positive effect that implementation of the general plan through rezoning and the Neighborhood Districts program will have on the supply of higher density, lower income housing and that it will satisfy the regional housing need in all income categories. There is also evidence of Gilroy's efforts to implement its Neighborhood Districts plan after adoption of the 2002 housing element, which dispels plaintiffs' suggestion that the plan is only one to create a task force and nothing more. Further, it is clear that while the Neighborhood Districts plan, which was relied on by the trial court in finding Gilroy compliant with the Least Cost Zoning Law, is not purely an action to rezone, its rezoning aspects are designed to yield an increased supply of affordable housing units, and if implemented, will do so according to the City's planning expert, David Driskell. And nothing about the Least Cost Zoning Law requires that compliance with it be in the form of action that is purely related to rezoning and nothing else.

In sum, substantial evidence supports that in revising its 2002 housing element and general plan, legislative acts which we have found substantially

complied with the then existing version of the Housing Element Law, the City was in compliance with the Least Cost Zoning Law. Plaintiffs have failed to carry their burden of showing otherwise.[39]

### DISPOSITION

The judgment is affirmed.

Premo, Acting, P. J., and Elia, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 18, 2007, S152338.

---

[39] We decline to consider the document offered in this court by plaintiffs relative to Gilroy Ordinance No. 2003-5, which was included in one of their motions for judicial notice. The document was not before the trial court and we will accordingly disregard it.